2014 PA Super 265

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| HYKEEM CARTER | |
| Appellee | No. 2339 EDA 2012 |

Appeal from the Order July 6, 2012
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0000285-2012

BEFORE:  GANTMAN, P.J., FORD ELLIOTT, P.J.E., BENDER, P.J.E.,
         PANELLA, J., DONOHUE, J., ALLEN, J., LAZARUS, J., MUNDY, J.,
         and OLSON, J.

OPINION BY MUNDY, J.:                          **FILED DECEMBER 02, 2014**

The Commonwealth appeals from the July 6, 2012 order, granting the motion to suppress filed by Appellee, Hykeem Carter.  After careful review, we reverse and remand for further proceedings.

We summarize the uncontradicted factual and procedural background of this case as follows.  On November 9, 2011, at approximately 9:00 p.m., Officer Matthew Blaszczyk of the Philadelphia Police Department was patrolling near 700 East Madison Avenue in Philadelphia, at the corner of Madison Avenue and G Street.  N.T., 6/5/12, at 4.  Officer Blaszczyk testified that this is a known drug corner and he personally has made multiple gun and drug arrests at this corner.  *Id.* at 5-6.  At said time, Officer Blaszczyk

and his partner, Officer White[1], were driving northbound on G Street when they observed Appellee standing on the northeast corner of the intersection. *Id.* at 4. Officer Blaszczyk "immediately observed a bulge in [Appellee's] left coat pocket." *Id.* at 5. Officer Blaszczyk believed that it was a heavy object because of "the way it weighed the jacket down and the way it protruded." *Id.* As Officers Blaszczyk and White drove northbound by Appellee, Officer Blaszczyk noted that, "Appellee looked in [their] direction and began to walk south." *Id.* The officers circled around the block and approached the intersection from a different direction. Upon returning to the intersection, Officer Blaszczyk observed that Appellee was back on the same corner, with the same bulge in his coat. *Id.* Officer Blaszczyk noted that he and Officer White did this multiple times.

> Each time we came down the street, it was a few times, maybe three or four times, [Appellee] would look in our direction and walk the opposite way whichever way we were coming from.
>
> And the way he turned his body was so that that bulge, you know, we could see it initially. And then he'd turn. So he wasn't in our view.

*Id.* at 6.

The officers got out of their vehicle and approached [Appellee], and again Appellee turned his body away from the officers so they could not see

---

[1] We note that Officer White's first name does not appear in the certified record.

the bulge in his coat. *Id.* at 8. Officer Blaszczyk further testified that based on the size and shape of the bulge, the way it weighed Appellee's coat down, and the way it swung, he believed the bulge to be a firearm. Officers Blaszczyk and White stopped Appellee and patted him down. *Id.* During the pat-down, Officer Blaszczyk noticed upon feeling the bulge, that he could "immediately feel the shape of a firearm." *Id.* Officer Blaszczyk recovered from Appellee's person "a 22-caliber Walther handgun, a Walther P-22 model." *Id.* at 9. The handgun was also "loaded with eight live rounds[]" of ammunition. *Id.*

Based on the above, Appellee was taken into custody. On January 7, 2012, the Commonwealth filed an information charging Appellee with one count each of possession of a firearm with manufacturer's number altered, firearms not to be carried without a license, and carrying a firearm in public in Philadelphia.[2] On April 19, 2012, Appellee filed an omnibus pre-trial motion, in part arguing for suppression of all evidence based on a violation of his Fourth Amendment rights. On June 5, 2012, the suppression court conducted an evidentiary hearing at which Officer Blaszczyk testified for the Commonwealth. Appellee did not offer any evidence at the suppression hearing. At the conclusion of this hearing, the suppression court denied Appellee's motion to suppress. The suppression court concluded that

_____

[2] 18 Pa.C.S.A. §§ 6110.2(a), 6106(a)(1), and 6108, respectively.

reasonable suspicion existed "based on the totality of the circumstances … [including the] high crime drug area … [a]nd the behavior of [Appellee]." *Id.* at 21. The suppression court also noted that Officer Blaszczyk testified "very credibly." *Id.*

Appellee sought reconsideration of the suppression court's order, which was granted. The next day, on June 6, 2012, the suppression court heard additional arguments from the Commonwealth and Appellee. The suppression court took the matter under advisement. On July 6, 2012, the suppression court entered a new order granting Appellee's motion to suppress. On August 6, 2012, the Commonwealth filed a timely notice of appeal.[3] On October 3, 2013, a divided panel of this Court affirmed the suppression court's order in an unpublished memorandum. The Commonwealth filed a timely petition for reargument *en banc* on October 17, 2013. On December 6, 2013, this Court entered an order granting the Commonwealth's petition for reargument *en banc* and the panel memorandum was withdrawn.

---

[3] We note that the 30th day following the suppression court's July 6, 2012 order was Sunday, August 5, 2012. It is manifest that when calculating a filing period, all weekends are excluded from said calculation. 1 Pa.C.S.A. § 1908. Therefore, the Commonwealth's notice of appeal filed on Monday, August 6, 2012, was timely. We also observe that on August 6, 2012, the Commonwealth contemporaneously filed a concise statement of matters complained of on appeal pursuant to Pennsylvania Rule of Appellate Procedure 1925(b), even though the suppression court had not ordered it to do so. The suppression court filed its Rule 1925(a) opinion on October 3, 2012.

In its substituted brief on reargument, the Commonwealth raises one issue for our review.

> Did a police officer, who had made more than 75 gun arrests, have reasonable suspicion to frisk [Appellee] where the officer, while on patrol in a high-crime neighborhood at night, observed [Appellee] on a street corner known for illegal drug and gun activity, and saw a weighted gun-like bulge with a sharp edge in [Appellee]'s jacket pocket, and [Appellee], four times within a ten-minute period, turned his body to conceal the bulge and walked away whenever the police drove by?

Commonwealth's Brief at 3.

We begin by noting our well-settled standard of review.

> When the Commonwealth appeals from a suppression order, we follow a clearly defined standard of review and consider only the evidence from the defendant's witnesses together with the evidence of the prosecution that, when read in the context of the entire record, remains uncontradicted. The suppression court's findings of fact bind an appellate court if the record supports those findings. The suppression court's conclusions of law, however, are not binding on an appellate court, whose duty is to determine if the suppression court properly applied the law to the facts.

**Commonwealth v. Miller**, 56 A.3d 1276, 1278-1279 (Pa. Super. 2012) (citations omitted), *appeal denied*, 70 A.3d 810 (Pa. 2013). In the instant case, the Commonwealth argues that the suppression court erred when it concluded that Officers Blaszczyk and White violated Appellee's Fourth Amendment rights when they stopped him and patted him down.

Commonwealth's Brief at 12-20. Appellee counters that the officers lacked any constitutional basis to stop and frisk him. Appellee's Brief at 14.

The Fourth Amendment of the Federal Constitution provides, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated …." U.S. Const. amend. IV. Likewise, Article I, Section 8 of the Pennsylvania Constitution states, "[t]he people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures …." Pa. Const. Art. I, § 8. Under Pennsylvania law, there are three levels of encounter that aid courts in conducting search and seizure analyses.

> The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or respond. The second, an "investigative detention" must be supported by reasonable suspicion; it subjects a suspect to a stop and period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Williams*, 73 A.3d 609, 613 (Pa. Super. 2013) (citation omitted), *appeal denied*, 87 A.3d 320 (Pa. 2014). In this case, the Commonwealth and Appellee agree that the seizure that took place was an investigative detention, requiring reasonable suspicion. Commonwealth's Brief at 6; Appellee's Brief at 12.

"The Fourth Amendment permits brief investigative stops … when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity." ***Navarette v. California***, 134 S. Ct. 1683, 1687 (2014). It is axiomatic that to establish reasonable suspicion, an officer "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." ***United States v. Sokolow***, 490 U.S. 1, 7 (1989) (internal quotation marks and citation omitted). Unlike the other amendments pertaining to criminal proceedings, the Fourth Amendment is unique as it has standards built into its text, *i.e.*, reasonableness and probable cause. ***See generally*** U.S. Const. amend. IV. However, as the Supreme Court has long recognized, ***Terry v. Ohio***, 392 U.S. 1 (1968) is an exception to the textual standard of probable cause. ***Florida v. Royer***, 460 U.S. 491, 498 (1983). A suppression court is required to "take[] into account the totality of the circumstances—the whole picture." ***Navarette***, ***supra*** (internal quotation marks and citation omitted). When conducting a ***Terry*** analysis, it is incumbent on the suppression court to inquire, based on all of the circumstances known to the officer *ex ante*, whether an objective basis for the seizure was present.[4] ***Adams v.***

---

[4] To further illustrate the scope of the required analysis, we note that although the officer in this case was correct that the bulge in Appellee's jacket was a gun, the Commonwealth does not get rewarded as a constitutional matter. Conversely, the Commonwealth would not be penalized if the officer had been wrong because ***Terry***, by its very nature,

*(Footnote Continued Next Page)*

***Williams***, 407 U.S. 143, 146 (1972). In addition, an officer may conduct a limited search, *i.e.*, a pat-down of the person stopped, if the officer possesses reasonable suspicion that the person stopped may be armed and dangerous. ***United States v. Place***, 462 U.S. 696, 702 (1983) (citation omitted).

In this case, Officer Blaszczyk testified to the following facts that led to his decision to stop and pat-down Appellee.

> Q: I'd like to direct your attention back to November 9, 2011 at approximately 9 p.m.[,] were you on duty as a Philadelphia police officer?
>
> A: Yes, I was.
>
> …
>
> Q: Can you please tell [the suppression court] what, if anything, you observed [Appellee] doing?
>
> …
>
> A: Your Honor, on that date and time, I was working with my partner Officer White, badge number 7097. We were all on routine patrol in the area when we drove northbound on "G" Street when we observed [Appellee].
>
> He was standing on the northeast corner. He was wearing all black clothing. I immediately observed a bulge in his left coat pocket.
>
> I could tell it was something heavy by the way it weighed the jacket down and the way it protruded.

*(Footnote Continued)* ─────────────

"accepts the risk that officers may stop innocent people." ***Illinois v. Wardlow***, 528 U.S. 119, 126 (2000).

My partner and I, as we drove northbound on the block, [Appellee] looked in our direction.

Q: Was he driving or were you? Was he in a vehicle or on the street?

A: [Appellee]?

Q: Yes.

A: He was standing. He was on foot.

Q: I thought you said when he drove -- [Appellee]?

A: No. When my partner and I drove northbound on "G" Street, he looked in our direction and began to walk south. My partner and I stopped. And he appeared to have left the area.

My partner and I circled back around. He came from a different direction this time. And he was back on that corner. I observed the bulge again and got another look at it.

My partner and I made observations over the course of about 10 minutes. And, eventually, my partner and I, based on our experience in that area, [knew that] "G" and Madison is a known drug corner.

It's a corner where I've made multiple gun arrests, multiple drug arrests. And based on my experience in that area, my partner and I decided to stop [Appellee].

Q: When you were observing [Appellee] was he doing anything other than standing on the corner? Was he looking at you or anything?

…

A: Each time we came down the street, it was a few times, maybe three or four times, he would look

- 9 -

in our direction and walk the opposite way whichever way we were coming from.

And the way he turned his body was so that that bulge, you know, we could see it initially. And then he'd turn. So he wasn't in our view.

Q: And about how many times did that happen when he turned his body away from you?

A: About three or four.

…

Q: And how long have you been a Philadelphia police officer?

A: About six years now.

Q: And has it always been in the 25th district?

A: Yes.

Q: How many gun arrests have you made in that area?

A: I'd say approximately 75 or more[].

…

Q: Have you made any gun arrests in that particular area of "G" and Madison?

A: Yes, I've made about, I'd say, between 8 and 10 just in that area alone.

Q: And, in your experience, and during this arrest, where on the person's person did you find these guns?

A: Most of the time it's either in a coat pocket or tucked in a waistband. But also I've seen people have it directly in their pants pocket. But all of my

gun arrests, I don't think any of them were carrying a gun in a holster.

…

Q:    And what occurred when you and your partner decided to get out of your vehicle?

A:    Well, my partner and I approached [Appellee] for investigation.  He turned his body away.  That bulge, that we believed was his firearm, he turned his body so that that item was away from us.

Q:    Just one question, what made you believe this was a firearm?

A:    Just based on the size, shape of it, weight.  It weighed his jacket down.  The way it kind of swung.  Just my experience in that area.  My experience in dealing with firearms.

…

Q:    And what did you do when you stopped him?

A:    Conducted just the pat-down for weapons.  And immediately when I felt that bulge, I could immediately feel the shape of a firearm.

Q:    And what, if anything, did you recover?

A:    I recovered a 22-caliber Walther handgun, a Walther P-22 model.  It was loaded with eight live rounds.

N.T., 6/5/12, at 3-9.

Based on the above-cited testimony, the Commonwealth argues that "Officer Blaszczyk's suspicions were aroused when he spotted [Appellee] on a street corner known for criminal activity, including illegal gun activity, and observed, in [Appellee]'s coat pocket, a weighted bulge described as having

a sharply angled contour." Commonwealth's Brief at 13. However, in Appellee's view there was no reasonable suspicion in this case because "[n]o tips were made, no crime was reported, no criminal conduct was observed, nor did Appellee engage in any conduct which would even suggest criminal activity." Appellee's Brief at 15.

The suppression court concluded Officer Blaszczyk did not have reasonable suspicion, as the observations he testified to making, viewed individually, were not enough to meet the threshold of reasonable suspicion. First, the suppression court addressed the Commonwealth's argument that "Officer Blaszczyk had reasonable suspicion because [Appellee] turned his body away from the officer so they would not see his pocket." Suppression Court Opinion, 10/3/12, at 7. The suppression court concluded that "[Appellee]'s action in moving around to prevent the officer from viewing the content of his pocket is innocent activity in nature and certainly cannot under established law lead the officer to believe that criminal activity was afoot." *Id.* The suppression court next addressed "the Commonwealth['s] attempt[] to establish reasonable suspicion because the officer noticed the bulge weighed down Appellee's pocket." *Id.* at 8. The suppression court rejected this factor because Officer Blaszczyk lacked any "expertise or specialized training that would lead him to believe that anything that is weighted down is a gun." *Id.* The suppression court then moved on to consider "the fact that the officer described the bulge as having a sharp

angle to indicate that the officer knew Appellee had a gun prior to the pat down." *Id.* The suppression court rejected this factor because "nothing was presented to [the suppression court] by way of experience or expertise to establish by the preponderance of the evidence that" the bulge was a gun. Therefore, the suppression court concluded "[t]he officer's observation of a bulge showing a sharp angle that weighed down in Appellee's jacket is inadequate." *Id.* Lastly, the suppression court rejected the Commonwealth's "attempts to impute experience to Officer Blaszczyk that he clearly [did] not possess." *Id.* Although the suppression court acknowledged Officer Blaszczyk's six years on the force up to that date, the court nevertheless concluded, "the Commonwealth failed to provide a nexus between the officer's purported experience and his ability to identify a nondescript bulge as a gun in the circumstances described therein." *Id.* at 8-9.

The Commonwealth argues that the suppression court's analysis was flawed in three ways. First, although the suppression court correctly stated a totality of the circumstances was required, in the Commonwealth's view, "the [suppression] court went on to a piecemeal analysis of various factors that, in its view, were individually insufficient to supply reasonable suspicion." Commonwealth's Brief at 12. The Commonwealth argues that this cuts against the principles announced by the Supreme Court in *United States v. Arvizu*, 534 U.S. 266 (2002). *Id.* at 13. Second, the

Commonwealth criticizes the suppression court's rejection of factors because they were equally consistent with innocent conduct. *Id.* at 16-17. Third, the Commonwealth avers the suppression court improperly rejected Officer Blaszczyk's observations as to the bulge in Appellee's coat because he lacked any specialized training in guns. *Id.* at 15.

In *Arvizu*, the defendant "was stopped by a border patrol agent while driving on an unpaved road in a remote area of southeastern Arizona." *Arvizu*, *supra* at 268. An eventual search of his van by the border patrol revealed 100 pounds of marijuana. *Id.* The District Court denied Arvizu's motion to suppress the marijuana based on a lack of reasonable suspicion of criminal activity by the border patrol. *Id.* However, the Ninth Circuit reversed after "examin[ing] each [factor] in turn." *Id.* at 272. In its view, "the District Court's analysis [relied] on a list of 10 factors … [but] seven of the factors, including [Arvizu]'s slowing down, his failure to acknowledge [the border patrol agent], the raised position of the children's knees [inside the van], and their odd waving carried little or no weight in the reasonable-suspicion calculus." *Id.* The Supreme Court granted *certiorari* and reversed, concluding that the Ninth Circuit's mode of analysis was contrary to the Court's reasonable suspicion cases.

> We think that the approach taken by the Court of Appeals here departs sharply from the teachings of these cases. The court's evaluation and rejection of seven of the listed factors in isolation from each other does not take into account the totality of the circumstances, as our cases have understood that

- 14 -

> phrase. The court appeared to believe that each observation by [the border patrol agent] that was by itself readily susceptible to an innocent explanation was entitled to no weight. **Terry**, however, precludes this sort of divide-and-conquer analysis.

**Id.** at 274.

After careful review, we agree with the Commonwealth that the suppression court engaged in the "divide-and-conquer" analysis proscribed by **Arvizu**. The suppression court evaluated individual factors, concluded at the end of each paragraph that they were insufficient to establish reasonable suspicion in some form and ended its analysis with the conclusion that the Commonwealth had not established reasonable suspicion as none of the factors testified to by Officer Blaszczyk were sufficient. **See** Suppression Court Opinion, 10/3/12, at 7-9. **Arvizu** and **Terry** forbid this mode of analysis.[5] **See Arvizu**, **supra**; **accord Commonwealth v. Walls**, 53 A.3d 889, 894-895 (Pa. Super. 2012).

The suppression court's conclusion that reasonable suspicion did not exist, in part, because "[Appellee]'s action in moving around to prevent the officer from viewing the content of his pocket is innocent activity …" is in conflict with **Arvizu** and the **Terry** line of cases. Suppression Court Opinion,

---

[5] We agree with the dissent that the suppression court titled its analysis at the outset as one concerning the totality of the circumstances. **See** Dissenting Opinion at 2, *quoting* Suppression Court Opinion, 10/3/12, at 7. Our disagreement with the suppression court, however, is based on its subsequent analysis of each factor in isolation.

10/3/12, at 7. Further, even in a case where one could say that the conduct of a person is **equally** consistent with innocent activity, the suppression court would not be foreclosed from concluding that reasonable suspicion nevertheless existed. **See Navarette**, **supra** (stating, "the level of suspicion the [**Terry**] standard requires is **considerably less** than proof of wrongdoing by a preponderance of the evidence[]") (internal quotation marks omitted; emphasis added), *quoting* **Sokolow**, **supra** at 7; **Commonwealth v. Caban**, 60 A.3d 120, 129 (Pa. Super. 2012) (stating, "even a combination of innocent facts, when taken together, may warrant further investigation by the police officer[]") (citation omitted), *appeal denied*, 79 A.3d 1097 (Pa. 2013). As the Supreme Court pointed out in **Arvizu**, in **Terry** itself, the conduct of the defendant could have easily been characterized as completely innocent.

> The officer in **Terry** observed [Terry] and his companions repeatedly walk back and forth, look into a store window, and confer with one another. Although each of the series of acts was perhaps innocent in itself, we held that, taken together, they warranted further investigation. **See also Sokolow***, supra*, at 9[] (holding that factors which by themselves were quite consistent with innocent travel collectively amounted to reasonable suspicion).

**Arvizu**, **supra** at 274-275 (internal quotation marks and some citations omitted); *see also Terry*, **supra** at 5-7.

The suppression court also disregarded Officer Blaszczyk's observations as to the bulge in Appellee's coat because "nothing was

presented to [the suppression court] by way of experience of expertise to establish by the preponderance of the evidence that" the bulge was a gun. Suppression Court Opinion, 10/3/12, at 8. The suppression court exclusively relied on this Court's decision in **Commonwealth v. Stevenson**, 894 A.2d 759 (Pa. Super. 2006), *appeal denied*, 917 A.2d 846 (Pa. 2007) for its rationale. **See** Suppression Court Opinion, 10/3/12, at 8.

In conducting a reasonable suspicion inquiry, a suppression court is required to "afford due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience[.]" **Commonwealth v. Brown**, 996 A.2d 473, 477 (Pa. 2010); **see also Commonwealth v. Foglia**, 979 A.2d 357, 361 (Pa. Super. 2009) (*en banc*) (concluding that reasonable suspicion for a **Terry** stop existed in part because the defendant "touched his waist area and sat down on a stoop behind some females … [and t]he police officer was aware, based upon his experience with armed suspects, that weapons are often concealed in a person's waistband[]"), *appeal denied*, 990 A.2d 727 (Pa. 2010). "Among the circumstances that can give rise to reasonable suspicion are the [officer]'s knowledge of the methods used in recent criminal activity and the characteristics of persons engaged in such illegal practices." **United States v. Mendenhall**, 446 U.S. 544, 563 (1980).

In **Stevenson**, this Court concluded that reasonable suspicion existed for a **Terry** stop based upon the following.

- 17 -

> The Commonwealth's evidence, which we must consider as credible in this appeal, establishes that the officers observed that [Stevenson] possessed a concealed weapon; that [Stevenson] acted suspiciously and in a manner that suggested that his weapon may be illegal or unlicensed; that [Stevenson] carried his weapon in a location on his person that, in Officer Absten's experience, indicated that the weapon may be illegal or unlicensed; and that Officer Absten had the requisite training and experience to make the necessary assessments as to whether [Stevenson] was carrying an illegal or unlicensed weapon.

*Stevenson*, *supra* at 772-773 (footnote omitted). Relevant to this appeal, this Court noted that the officer based his decision to stop Stevenson in part due to heightened training the officer had received in his career.

> Officer Absten then made his own assessment, based on Bureau of Alcohol, Tobacco and Firearms ("ATF") training he had received on identifying armed subjects and types of firearms. This training had included means of identifying certain mannerisms characteristic of persons not professionally familiar with carrying handguns. Also, the police officers had been trained to be cognizant of apparently weighted pockets and the visible outline of firearms pressing from inside the pockets.

*Id.* at 764. It is from these two passages in *Stevenson* that the suppression court rejected Officer Blaszczyk's observations of Appellee in this case, because he lacked any specific or special training like the officer in *Stevenson* had received.

We agree with the *Stevenson* Court that any specialized training received by an officer is undoubtedly relevant to, and may be critical in, conducting a reasonable suspicion analysis. However, the suppression

- 18 -

court's decision in this case goes one step beyond **Stevenson**, insofar that the suppression court implicitly **required** Officer Blaszczyk to have similar heightened training in order for observations to have any significance. In the suppression court's view, "[t]he mere fact that an officer carries [a] gun, knows other people who carry guns, received training at the academy or has been in the force for six years do[es] not aid the officer in establishing reasonable suspicion … in this case." Suppression Court Opinion, 10/3/12, at 8.

The suppression court's rationale is in tension with the prior cases cited above. In this case, Officer Blaszczyk formed his suspicions based in part on his six years' experience as a Philadelphia police officer, conducting over 75 gun arrests, eight to ten of which were specifically located at the corner at which he encountered Appellee. Officer Blaszczyk further testified that in his experience, many people who carry guns do so in their coat pockets. **See** N.T., 6/5/12, at 7, 8. Officer Blaszczyk was permitted to utilize his "knowledge of the methods used in recent criminal activity" in order to form his decision as to whether to stop Appellee. **Mendenhall**, **supra**. Officer Blaszczyk was not required to receive specialized training in order to make his decision. Nothing contained in **Stevenson** suggests this Court intended to impose such a burdensome requirement on law enforcement.

In the case *sub judice*, the Commonwealth, through Officer Blaszczyk, established that Appellee was in a high-crime area, at night, with a weighted and angled bulge in his coat pocket. Furthermore, Appellee was alerted to the officers' presence and intentionally turned his body away from them, at least three times, to conceal the bulge. The officers also observed Appellee walking away from the known drug corner whenever the officer's passed by it.[6] In our view, the Commonwealth sufficiently showed that Officer Blaszczyk had the reasonable suspicion to first seize Appellee as well as conduct the limited **Terry** pat-down, as the entire basis for Officer Blaszczyk's seizure before the pat-down was that Appellee was armed and dangerous. **See Place**, **supra**; **Foglia**, **supra** at 361 (stating, "[s]ince the criminal activity in question involved possession of a firearm and since

_____

[6] We agree with Appellee's assertion that "[w]here an officer, without reasonable suspicion or probable cause, approaches an individual, the individual has a right to ignore the police and go about his business." Appellee's Brief at 15, *citing* **Royer**, **supra** at 497-498. However, we cannot agree that "[t]he approach urged by the Commonwealth would also allow a stop and frisk whenever an officer in a high-crime area encounters an individual who wears baggy clothing … appears nervous in reaction to seeing the police, but does not try to evade or flee." **Id.** at 22. It is axiomatic that an ordinary citizen may stand on a street corner, even in a high-crime area as "[o]ur caselaw is quite emphatic that an individual's mere presence in a high crime area is manifestly insufficient to justify a **Terry** stop." **Commonwealth v. Alaya**, 791 A.2d 1202, 1210 (Pa. Super. 2002). Nothing in our decision today circumscribes an individual's otherwise general right to stand or be present on a street corner. **See, e.g.**, **Commonwealth v. Chambers**, 55 A.3d 1208, 1216 (Pa. Super. 2012) (concluding no reasonable suspicion existed where the defendant was walking on a street in a high-crime area and took a step back after a probation officer called out his name).

[Foglia]'s act of patting his waistband bolstered [the officer]'s reasonable belief that [Foglia] actually had a gun in his pants, [the officer] was constitutionally permitted to conduct a patdown search of [Foglia]'s waistband[]").

Additionally, the cases Appellee has cited do not alter our conclusion. Appellee primarily relies on **Commonwealth v. Martinez**, 588 A.2d 513 (Pa. Super. 1991), *appeal denied*, 608 A.2d 29 (Pa. 1992), **In re J.G.**, 860 A.2d 185 (Pa. Super. 2004), and **Commonwealth v. Reppert**, 814 A.2d 1196 (Pa. Super. 2002) (*en banc*). In **Martinez**, this Court held that the officer did not have reasonable suspicion of criminal activity where the defendant "walked quickly away from a group of people on a street corner after observing a nearby police vehicle … [and] where … officers observed a bulge in her front pocket[.]" **Martinez**, *supra* at 514. In **J.G.**, this Court reached the same conclusion "where the only evidence of criminal wrongdoing was [the juvenile]'s presence in a high crime area combined with his decision to 'walk away' from the police officers upon seeing their approach." **J.G.**, *supra* at 187. Finally, in **Reppert**, this Court held that no reasonable suspicion existed based on "a police officer's observation of head and shoulder movements of the rear seat passenger in a motor vehicle, coupled with the officer's conclusion … [that Reppert] appeared 'very, very nervous[.]'" **Reppert**, *supra* at 1199. In each of these cases, while there may be one factor in common with the instant case, the totality of

circumstances in each case is not analogous to the case at bar, and therefore do not control the constitutional analysis here.[7] In **Martinez**, the defendant did not consistently position or turn her body so as to conceal something from law enforcement, as Appellee did here. In **J.G.**, the police did not observe an angled bulge in the juvenile's coat pocket, as the officers did here. Finally, in **Reppert**, the defendant was not stopped in a high-crime area, nor was there any type of angled bulge. In sum, as we conclude that none of the cases cited by Appellee are persuasive in the instant matter, the suppression court legally erred when it concluded that Appellee's Fourth Amendment rights have been violated. **See Miller**, **supra**.

Based on the foregoing, we conclude that the suppression court legally erred when it granted Appellee's motion to suppress. Accordingly, the suppression court's July 6, 2012 order is reversed, and the case is remanded for further proceedings, consistent with this opinion.

---

[7] Appellee also relies on the Sixth Circuit's decision in **United States v. Patterson**, 340 F.3d 368 (6th Cir. 2003). In that case, the Court of Appeals concluded that no reasonable suspicion existed based on the defendant standing with a group, walking away from the officers as they approached and where one member of the group, not Patterson, "ma[de] a throwing motion towards the bushes." **Id.** at 369-370. We note, "this Court is not bound by decisions of federal courts inferior to the United States Supreme Court, even though we may look to them for guidance." **Commonwealth v. Huggins**, 68 A.3d 962, 968 (Pa. Super. 2013) (citation omitted), appeal denied, 80 A.3d 775 (Pa. 2013). Additionally, the United States presented even less than the Commonwealth had in **Martinez**, as in **Patterson**, the Court of Appeals highlighted that the one person who made any tossing movements was not the defendant.

Order reversed. Case remanded. Jurisdiction relinquished.

President Judge Gantman, President Judge Emeritus Ford Elliott, President Judge Emeritus Bender, and Judges Panella, Allen and Olson join the opinion.

Judge Lazarus files a dissenting opinion in which Judge Donohue concurs in the result.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/2/2014