J-A11018-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF |
| :--- | :---: |
| Appellee | PENNSYLVANIA |
| v. | |
| MICHAEL WARREN | |
| Appellant | No. 2246 EDA 2015 |

Appeal from the Judgment of Sentence June 25, 2015
In the Court of Common Pleas of Delaware County
Criminal Division at No(s): CP-23-CR-0001483-2015

BEFORE:  SHOGAN, MUNDY, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:          **FILED JULY 22, 2016**

Appellant, Michael Warren, appeals from the judgment of sentence entered in the Delaware County Court of Common Pleas after the trial court convicted him of possession of a small amount of marijuana[1] and possession of drug paraphernalia.[2]  Appellant contends he was subject to an unlawful stop without reasonable suspicion.  We reverse.

On February 19, 2015, Appellant was arrested for the above offenses. On May 13, 2015, Appellant filed a motion to suppress contending his arrest resulted from an illegal seizure and search.  Pre-Trial Mot., 5/13/13, at 1-2 (unpaginated).  The trial court held a hearing on May 21, 2015, at which the

---

[*] Former Justice specially assigned to the Superior Court.

[1] 35 P.S. § 780-113(a)(31).

[2] 35 P.S. § 780-113(a)(32).

only evidence presented was the testimony of Upper Darby Police Officer Michael DeHoratius. At the time of the hearing, Officer DeHoratius had been a patrol officer for Upper Darby Police Department for three years, and spent the previous seven years as a police officer in Tredyffrin Township. N.T., 3/21/15, at 4-5. He received training in the packaging and recognition of illegal narcotics and has been involved in "hundreds of arrests" during his career. *Id.* at 5. In his experience patrolling the east side of Upper Darby, he has "seen shootings, shots fired, aggravated assaults, guns, robberies, burglaries, home invasions, typically violent crimes." *Id.* at 6.

He testified on direct-examination, in relevant part, as follows:

Q. And around February 29, 2015, were you aware of any incidents that were going on in specifically the area of Clover Lane and Crosley . . . Road?

\* \* \*

A. Yes. In and around that area there were businesses being robbed at gunpoint. There was also pedestrians being robbed. I believe three nights earlier I took a robbery of a plow driver right at . . . Clover and Greenwood a plow driver was robbed with an implied gun in that area.

Q. And was that during that incident, that robbery, was that person apprehended?

A. No.

Q. So they just gave you information on that robber?

A. That's correct.

Q. And what information did you receive?

A. There was two black males, both kind of generic description of all dark clothing and skinny?

Q. All dark clothing and skinny?

A. Yes.

Q. Besides the one three [d]ays beforehand and you said there were other robberies in the area?

A. Yes. The stores on Baltimore Pike which is probably a quarter to half a mile from that area were being robbed by males at gunpoint.

Q. And with a similar description?

A. Similar description, yes.

Q. And on that night around 9:00 . . . in the evening did you observe anything at this time?

A. Yes. I was on patrol in the area specifically due to some of the robberies and I observed a male kind of wandering around the areas. He was later identified as [Appellant] . . .

* * *

Q. . . . What exactly did you notice [Appellant] doing?

A. Well, it was February. It was a very cold winter and there's not much pedestrian traffic in that area as there is during a spring, fall or summer time. I noticed that he was walking in the area. He was in the middle of the street. I then lost sight of him. I observed him then walking on Clover Lane towards Rawling . . . I lost sight of him and then I observed him walking back down Clover Lane towards Crosley.

Q. When you say he was in the middle of the street, how long was he in the middle of the street for?

A. I would say for a matter of seconds.

Q. Was he doing anything while he was – was he just walking straight ahead?

A. No.  The first time I observed him he was just kind of looking around.

Q. Looking around.  And then you lost him a couple times you said, correct?

A.  Yes. This was over a time about between 10 and 20 minutes.

Q. Ten and 20 minutes.  And then you observed—did you observe him doing anything else? Was he just walking by himself or—

A. No.  One of the last times I observed him walking down Clover Lane, he'd be walking east, he was starting to become very close to another male that was walking down the street to the rear of him.

Q. How close would you say?

A. I would say within a matter of feet.

Q. One foot, two feet, three feet?

A. I would say within three to five feet.  Definitely closer than anybody would typically walk behind another person.

Q. And he was behind the person?

A. Yes.

Q. And then what did you see – what did you do after you saw that?

A. Well, at that point, I decided to go stop and find out what was going on and I had to drive down another one-way street and then come back and drive up Clover which was one-way.

Q. Okay.  And then did you do that?

A. Yes. So at that point [Appellant] was stopped on the street.

Q. Okay. And was there only the one pedestrian you saw him walk by or was there anyone else?

A. No, just the one.

Q. Okay. And then so you stopped and what happened when you stopped?

A. I stopped him. I asked him not to move. He immediately was patted—when I observed him he had a winter coat on and kind of the nature of the winter coat he had bulky pockets. And at that point for my safety he was patted down for weapons. When he was patted down for weapons, I felt in his right pocket two small glass containers which from my training and experience I knew it's typical for packaging illegal narcotics. After the pat-down for weapons was done they were seized and in them was a small amount of marijuana.

*Id.* at 7-10.

He further testified that he personally witnessed a robbery of a woman in Upper Darby, approximately one and one-half to two miles from where he stopped Appellant, two-and-one-half years before. *Id.* at 11. He described Appellant as wearing "dark clothing" the night he was stopped and agreed with the Commonwealth that the suspects in the recent robbery, three days prior, were described as wearing "dark clothing." *Id.* at 11-12.

On cross-examination, Officer DeHoratius reiterated what drew his attention to Appellant: "he originally caught my attention by walking throughout the area while it was cold. It was in the middle of February and again he caught my attention . . . by walking a short distance behind

somebody." *Id.* at 16. He could not recall a description of the individual he observed Appellant was near, and he testified he did not "believe" Appellant made any movement toward the individual. *Id.*

With regard to his decision to pat down Appellant, he testified as follows.

> Q. . . . And you indicated that you ended up patting him down for your safety, correct?
>
> A. Yes.
>
> Q. And that was based on the fact that there were these robbery reports in the area?
>
> A. Correct.
>
> Q. And you also testified that he had a winter coat on, correct?
>
> A. Yes.
>
> Q. And it's cold outside, its February?
>
> A. Yeah, it's the middle of February during the very cold winter we just had.

*Id.* at 19.

The trial court denied Appellant's motion, and Appellant proceeded immediately to a stipulated-bench trial. *Id.* at 24. The Commonwealth and Appellant stipulated that the glass vials seized from Appellant contained marijuana, and the trial court found Appellant guilty of the above crimes. *Id.* at 29, 32; Trial Ct. Order, 5/21/15.

On June 25, 2015, the trial court sentenced Appellant to fifteen to thirty days' imprisonment on possession of small amount of marijuana and a consecutive term of time-served to six months' probation on drug paraphernalia. Sent. Order, 6/25/15. Appellant filed a timely notice of appeal on July 23, 2015. Appellant filed a court-ordered Pa.R.A.P. 1925(b) statement on August 13, 2015, and the trial court issued a responsive opinion on August 28, 2015. The trial court concluded that Officer DeHoratius possessed reasonable suspicion that criminal activity was afoot. Trial Ct. Op., 8/28/16, at 6.

On appeal, Appellant raises the following issue:

> Whether the [trial c]ourt erred in denying [Appellant's] motion to suppress evidence where the stop in question, as well as the subsequent search of his person, violated the precepts of **Terry v. Ohio**[, 392 U.S. 1 (1968)] and, as such, violated his rights under the Fourth and Fourteenth Amendments of the United States Constitution, and Article 1, Section 8 of the Pennsylvania Constitution?

Appellant's Brief at 5.

Appellant argues Officer DeHoratius "detained [Appellant] without reasonable suspicion that criminal activity was afoot and patted him down without reasonable suspicion that he was armed and dangerous." *Id.* at 11. Specifically, he contends the stop was "based on nothing more than a hunch" and Officer DeHoratius "cited no specific or articulable facts to establish any kind of belief that [Appellant] was armed and dangerous." *Id.* at 18-19. Appellant further contends the seizure of the items in his pocket

- 7 -

was impermissible because their incriminating nature was not immediately apparent to Officer DeHoratius. *Id.* at 22-28. For the reasons that follow, we agree the trial court erred in denying Appellant's suppression motion.

> Our standard of review in addressing a challenge to the denial of a suppression motion is
>
>> limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the legal conclusions are erroneous. The suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.
>
> *Commonwealth v. Jones*, . . . 988 A.2d 649, 654 ([Pa.] 2010) . . . . Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress. *See In re L.J.*, . . . 79 A.3d 1073, 1083-87 ([Pa.] 2013).

*Commonwealth v. Ranson*, 103 A.3d 73, 76 (Pa. Super. 2014), *appeal denied*, 117 A.3d 296 (Pa. 2015).

> The Fourth Amendment of the Federal Constitution provides, "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated. . . ." U.S. Const. amend. IV. Likewise, Article I, Section 8 of the Pennsylvania Constitution states, "[t]he people shall be

secure in their persons, houses, papers and possessions from unreasonable searches and seizures. . . ." Pa. Const. Art. I, § 8. Under Pennsylvania law, there are three levels of encounter that aid courts in conducting search and seizure analyses.

The first of these is a "mere encounter" (or request for information) which need not be supported by any level of suspicion, but carries no official compulsion to stop or respond. The second, an "investigative detention" must be supported by reasonable suspicion; it subjects a suspect to a stop and period of detention, but does not involve such coercive conditions as to constitute the functional equivalent of arrest. Finally, an arrest or "custodial detention" must be supported by probable cause.

*Commonwealth v. Williams*, 73 A.3d 609, 613 (Pa. Super. 2013) (citation omitted), *appeal denied*, . . . 87 A.3d 320 ([Pa. 2014). . . .

The Fourth Amendment permits brief investigative stops[3] . . . when a law enforcement officer has a particularized and objective basis for suspecting the particular person stopped of criminal activity. It is axiomatic that to establish reasonable suspicion, an officer must be able to articulate something more than an inchoate and unparticularized suspicion or hunch. Unlike the other amendments pertaining to criminal proceedings, the Fourth Amendment is unique as it has standards built into its text, *i.e.*, reasonableness and probable cause. *See generally* U.S. Const. amend. IV. However, as the Supreme Court has long recognized, *Terry v. Ohio*, . . . is an exception to the textual standard or probable cause. A suppression court is required to take[] into account the totality of the circumstances—the whole picture. When conducting a *Terry* analysis, it is incumbent on the suppression court to inquire, based on all of the

_____

[3] The parties agree Appellant was subjected to an investigative stop, which requires reasonable suspicion. *See* Appellant's Brief at 11; Commonwealth's Brief at 8-9.

- 9 -

circumstances known to the officer *ex ante*, whether an objective basis for the seizure was present. In addition, an officer may conduct a limited search, i.e., a pat-down of the person stopped, if the officer possesses a reasonable suspicion that the person stopped may be armed and dangerous.

***Commonwealth v. Carter***, 105 A.3d 765, 768-69 (Pa. Super. 2014) (*en banc*) (some quotation marks and citations omitted), *appeal denied*, 117 A.3d 295 (Pa. 2015).

Review of an officer's decision to frisk for weapons requires balancing two legitimate interests: that of the citizen to be free from unreasonable searches and seizures; and that of the officer to be secure in his personal safety and to prevent harm to others. To conduct a limited search for concealed weapons, an officer must possess a justified belief that the individual, whose suspicious behavior he is investigating at close range, is armed and presently dangerous to the officer or to others. In assessing the reasonableness of the officer's decision to frisk, we do not consider his unparticularized suspicion or hunch, but [rather] . . . the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.

***Commonwealth v. Zhahir***, 751 A.2d 1153, 1158 (Pa. 2000) (citations and quotation marks omitted).

We conclude the trial court erred in determining there was reasonable suspicion to subject Appellant to an investigative stop and search. ***See Ranson***, 103 A.3d at 76. Instantly, the uncontradicted testimony of Officer DeHoratius reveals three days before he encountered Appellant, there was a robbery reportedly committed by "two black males" who were "skinny" and wearing "all dark clothing." N.T. at 7. On February 19, 2015, he observed

- 10 -

Appellant "for a matter of seconds" walking in the street. *Id.* at 8. Officer DeHoratius surveyed the area for approximately ten to twenty minutes after initially observing Appellant and, at times, lost sight of Appellant. *Id.* at 9. He observed Appellant walk "within three to five feet" of another individual and "at that point[,] [he] decided to . . . stop" Appellant. *Id.* Officer DeHoratius testified the reason his attention turned to Appellant was because it was cold outside, but the officer observed that he had a winter coat and reasoned, "it's the middle of February during the very cold winter we just had." *Id.* at 16, 19. Further, Officer DeHoratius did not articulate any suspicious or furtive movements by Appellant, with the exception of "walking a short distance behind somebody." *Id.* at 16.

Under the totality of the circumstances, there was no objective basis for the stop and search of Appellant's person. *See Carter*, 105 A.3d at 768-69. Moreover, the fact that Appellant wore a coat during "the very cold winter" is insufficient to establish a reasonable suspicion that he was armed and dangerous. *See id.*; N.T. at 16. Officer DeHoratius' testimony failed to demonstrate that his investigation of Appellant's "suspicious behavior [that] he [was] investigating at close range" led him to the justified belief that Appellant was armed and dangerous.[4] *See Zhahir*, 751 A.2d at 1158.

---

[4] We recognize Appellant was in the vicinity where robberies had recently been reported. However, we are unpersuaded that the generic description of "two black males" wearing dark clothing bears much weight in a
*(Footnote Continued Next Page)*

Accordingly, we reverse the trial court's denial of Appellant's suppression motion, vacate the judgment of sentence, and remand for proceedings consistent with this memorandum.[5]

Judgement of sentence vacated. Case remanded. Jurisdiction relinquished.

Judge Shogan joins the Memorandum.

Judge Mundy notes her dissent.

Judgment Entered.

_Joseph D. Seletyn, Esq._
Joseph D. Seletyn, Esq.
Prothonotary

Date: 7/22/2016

_(Footnote Continued) _____

reasonable suspicion inquiry when the generic description was reported three days prior to Appellant's encounter with police. **Cf. In re D.M.**, 727 A.2d 556, 557-58 (Pa. 1999) (finding reasonable suspicion to stop the appellant when he and "companions matched the number of suspects . . . , they matched the race of the suspects; they were the only individuals observed in the vicinity of the robbery; they were seen a mere one-half block away **within approximately one minute of the crime**; and they acted evasively when they saw the police vehicle." (emphasis added)) .

[5] Because we conclude Officer DeHoratius subjected Appellant to an unconstitutional stop and search, we need not address the portion of Appellant's argument pertaining the incriminating nature of the items seized.