J-S53025-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| KEVIN BLENMAN, | |
| Appellant | No. 1430 EDA 2016 |

Appeal from the Judgment of Sentence April 14, 2016
In the Court of Common Pleas of Philadelphia County
Criminal Division at No(s): CP-51-CR-0013908-2012

BEFORE:  BENDER, P.J.E., OLSON, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY OLSON, J.:                **FILED September 5, 2017**

Appellant, Kevin Blenman, appeals from the judgment of sentence entered on April 14, 2016, following his bench trial convictions for persons not to possess a firearm, carrying a firearm on public streets in Philadelphia, and firearms not to be carried without a license.[1]  We affirm.

The trial court summarized the facts of this case as follows:

On November 5, 2012, Philadelphia police officer Jeffrey Opalski [(Officer Opalski)], along with his partner Officer Mundrick,[2] were on patrol in an unmarked police car in plain clothes.  At the time, Officer Opalski had been a police officer for two and a half years with ten [firearm-related] arrests, along with specific training in firearms and the methods in which they are carried on

---

[1]  18 Pa.C.S.A. §§ 6105(a)(1), 6106(a)(1), and 6108, respectively.

[2]  We were unable to determine Officer Mundrick's first name from the certified record.

a person. The officers were traveling along the 5100 block of Viola St[reet] in Philadelphia, when they observed [Appellant] standing in front of an abandon[ed] building. Officer Opalski testified that drug sales are typically conducted in and around abandoned properties. The officers were patrolling in that specific area because there were reports of drug sales and gun violence associated with rival drug gangs. As the officers drove down Viola St[reet], [Appellant] looked in their direction, turned and walked through an alleyway next to an abandoned house. The officers then continued down Viola St[reet], circled the block a few times, and again spotted [Appellant] on a nearby block. At this time, he was walking with a noticeable limp and had a large bulge in the front area of his waistband. The officers stopped their car, exited and identified themselves as police officers. Immediately [Appellant] grabbed his waistband area and ran from the officers. After running for about a block, the officers observed [Appellant] remove a large silver revolver from his waistband and discard it in a pile of trash bags. He was arrested shortly thereafter.

[Appellant] was taken to a local hospital for some minor injuries and then released back to police custody around 2:00 a.m. the following day. [Appellant] was initially too groggy to be interviewed at that time. On November 6, 2012, at around 3:20 a.m.[,] Detective [Matthew] Maurizio read [Appellant] his *Miranda*[3] warnings and conducted a post-arrest interview. [Appellant] did not appear to be in any distress at that point, was not injured, and was lucid in his recollection. [Appellant] then gave a very detailed statement of his activities that night, including where and from whom he received the gun and what he was intending to do with it. He read and signed the statement along with his *Miranda* warnings.

Trial Court Opinion, 11/14/2016, at 2-3 (record citations omitted).

Prior to trial, Appellant filed a motion to suppress the physical evidence recovered, as well as his subsequent statement to police. The trial court held a suppression hearing on December 1, 2014 and denied relief.

---

[3] *Miranda v. Arizona*, 384 U.S. 436 (1966).

On February 3, 2016, the trial court held a bench trial and convicted

Appellant of the aforementioned firearm offenses. On April 14, 2016, the

trial court sentenced Appellant to an aggregate term of two and one-half to

five years of imprisonment followed by five years of probation. This timely

appeal resulted.[4]

On appeal, Appellant presents the following issue for our review:

Did not the lower court err in denying Appellant's motion to suppress physical evidence and his statement obtained in violation of the 4th Amendment of the United States Constitution, and Article I, Section 8 of the Pennsylvania Constitution, as said evidence and statement were the fruits of an unconstitutional stop unsupported by reasonable suspicion?

Appellant's Brief at 3.

In sum, Appellant argues:

When initially observed by police, Appellant was standing in front of an abandoned house, doing nothing illegal or suspicious. He then walked away; again, an action neither illegal [n]or suspicious. Officer Opalski decided, solely on the basis that the house where Appellant was standing was abandoned, to try to find him, to do so [by] circling the block not once but "a few times," and expanding his area of search. Finally he observed Appellant at a busy intersection, this time doing nothing but walking in what the officer described as "a labored manner," with a bulge in his waistband. Officer Mundrick thereupon exited the police vehicle, identifying himself, and demanding that Appellant stop. Although Appellant fled, at the point when Officer

---

[4]   Appellant filed a timely notice of appeal on May 11, 2016. On June 20, 2016, the trial court issued an order directing Appellant to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Appellant complied timely on July 12, 2016. The trial court issued an opinion pursuant to Pa.R.A.P. 1925(a) on November 14, 2016.

Mundrick made his demand Appellant was unlawfully seized, and the firearm ultimately recovered[, and his subsequent statements to police, were] fruit of the unlawful seizure. Because Appellant was stopped illegally, the lower court erred in denying his motion to suppress the [] evidence [obtained] from the illegal stop.

*Id.* at 9-10.

Our standard of review for the denial of a suppression motion is

whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. When reviewing rulings of a suppression court we must consider only the evidence of the prosecution and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the record supports the findings of the suppression court, we are bound by those facts and may reverse only if the legal conclusions drawn therefrom are in error.

*In re M.D.*, 781 A.2d 192, 195 (Pa. Super. 2001) (citation omitted).

In addition,

it is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony. The suppression court is also entitled to believe all, part or none of the evidence presented. Finally, at a suppression hearing, the Commonwealth has the burden of establishing by a preponderance of the evidence that the evidence was properly obtained.

*Commonwealth v. Galendez*, 27 A.3d 1042, 1046 (Pa. Super. 2011) (*en banc*).

We have further determined:

Article I, § 8 of the Pennsylvania Constitution and the Fourth Amendment of the United States Constitution afford protections against unreasonable searches and seizures. Among the protections is the requirement that an officer have reasonable suspicion before an investigatory stop.

- 4 -

Our [S]upreme [C]ourt has interpreted Article I, § 8 protection more broadly than the Fourth Amendment and has found that a seizure occurs when an officer gives chase. Under Pennsylvania law, any items abandoned by an individual under pursuit are considered fruits of a seizure. Those items may only be received in evidence when an officer, before giving chase, has at least the reasonable suspicion necessary for an investigatory stop. Stated another way, when one is unconstitutionally seized by the police, *i.e.* without reasonable suspicion or probable cause, any subsequent flight with the police in pursuit continues the seizure and any contraband discarded during the pursuit is considered a product of coercion and is not admissible against the individual.

In deciding whether reasonable suspicion exists for an investigatory stop, our analysis is the same under both Article I, § 8 and the Fourth Amendment.

The fundamental inquiry is an objective one, namely, whether the facts available to the officer at the moment of the intrusion warrant a man of reasonable caution in the belief that the action taken was appropriate. This assessment, like that applicable to the determination of probable cause, requires an evaluation of the totality of the circumstances, with a lesser showing needed to demonstrate reasonable suspicion in terms of both quantity or content and reliability.

Among the factors to be considered in forming a basis for reasonable suspicion are tips, the reliability of the informants, time, location, and suspicious activity, including flight.[5]

While a tip can be a factor, an anonymous tip alone is insufficient as a basis for reasonable suspicion. Likewise,

_____

[5] Furthermore, in examining factors giving rise to reasonable suspicion, "we must give due weight ... to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience." *Commonwealth v. Houck*, 102 A.3d 443, 456 (Pa. Super. 2014) (internal citation and original brackets omitted). "A police officer cannot reach such a conclusion based upon an 'unparticularized suspicion' or 'hunch.'" *Commonwealth v. Arch*, 654 A.2d 1141, 1144 (Pa. Super. 1995) (citation omitted).

presence in a high crime area alone or flight alone does not form the basis for reasonable suspicion. However, a combination of these factors may be sufficient.

*       *       *

Case law has established that certain facts, taken alone, do not establish reasonable suspicion. However, a combination of these facts may establish reasonable suspicion.

*Id.* at 196–197 (internal citations, quotations, and original brackets omitted).

Here, the trial court concluded:

[T]he Commonwealth established by a preponderance of the evidence that officers had reasonable suspicion to attempt to stop [Appellant]. [...T]he officers observed [Appellant] standing in front of an abandon[ed] house in a known violent crime area. They drove past him and he turned around and went down an alleyway. [...T]hey [again] observed him turn and walk[] away. Additionally, officers observed a very large bulge in his waistband area that was indicative of a large handgun.

*       *       *

The officers' [knowledge and] experience in that area making arrests, training in the handling and carrying of firearms, [Appellant] turning and walking away from officers and a large bulge in his waistband area provided sufficient articulable facts which gave officers reasonable suspicion to stop him in an investigatory detention.

Trial Court Opinion, 11/14/2016, at 5.

Based upon our standard of review and careful examination of the certified record, we agree with the trial court's assessment and discern no abuse of discretion in denying suppression. At the time of the incident, Officer Opalski had two and one-half years of experience as a police officer and he had made approximately ten arrests involving firearms violations.

N.T., 12/1/2014, at 8, 25. Additionally, he previously completed "improvised and concealed weapons training" through the Institute of Law Enforcement Education. *Id.* at 33. Officer Opalski testified that the officers were on patrol in an area known for narcotics trafficking, at 1:00 a.m., where there had been three shootings the week prior to this incident. *Id.* at 9. The prior shootings were linked to drug sales in front of the abandoned property, already known to police, where Appellant was seen first standing. *Id.* at 12. Appellant looked in Officer Opalski's direction, turned, and walked into an alleyway. *Id.* When Officer Opalski saw Appellant again, he noticed Appellant "was laboring with his walk as if something [] heavy [was] in his waistband" which, in his experience and training, was "the typical location for an illegal firearm to be carried." *Id.* at 16. Officer Opalski opined that "most guns are carried illegally in the front of [the] waistband without a holster." *Id.* He also testified that the location of the bulge and its size led him to believe that Appellant could be carrying a large firearm. *Id.* at 17.

Based upon the time and location of the incident, Appellant's suspicious behavior, the officer's training and experience, and the identification of a bulge in Appellant's waistband (a characteristic place to conceal an illegal firearm) before stopping Appellant, Officer Opalski had reasonable suspicion to believe Appellant was engaged in criminal activity. Contrary to Appellant's assertions, the totality of the circumstances led Officer Opalski to believe that Appellant possessed a firearm in violation of

18 Pa.C.S.A. § 6106(a)(1). Thus, the Commonwealth met its burden of proof and suppression was not warranted.

Finally, the case law upon which Appellant relies does not compel a different result. Appellant principally relies upon our decision in *Commonwealth v. Martinez*, 588 A.2d 513 (Pa. Super. 1991). *See* Appellant's Brief at 13-14. In that case, police officers in plain clothes in an unmarked car approached an intersection where four or five individuals were standing on a corner. Martinez departed in one direction and the others went another. The police drove alongside Martinez and observed her "holding her hands in the front of her coat, leaning forward, as if to be holding something, leaning forward, walking quickly up the street." *Martinez*, 588 A.2d at 515. When the police ordered Martinez to put her hands on the police vehicle, a bag containing contraband fell from her coat. We noted that the trial court "mixed together facts of events occurring both *before* and *as a result of* the stop" and "seemingly believed that Martinez brought the search and seizure upon herself by 'drawing attention to herself.'" *Id.* at 516 (emphasis in original). We concluded that the only "articulable facts attributable to Martinez" was that she "walked quickly away from a street corner, at 12:20 a.m." and "[s]he was holding her hands in the front of her coat and walking quickly up the street." *Id.*

In stark contrast to *Martinez*, Officer Opalski articulated his specific observation that, prior to stopping Appellant, he saw a bulge in Appellant's waistband which, in his experience and training, led him to believe that

- 8 -

Appellant was carrying a large firearm given the size and the location of the bulge. In **Martinez**, we said that the police had little more than an unparticularized suspicion or hunch that the defendant was engaged in criminal activity when they observed her holding her coat out in front of her. Martinez could have just as easily been holding any number of innocuous items at the time of the seizure. Here, however, Officer Opalski's observations showed that, prior to stopping Appellant, he was able to state, with specific detail, his belief that Appellant was carrying a gun, a violation of 18 Pa.C.S.A. § 6106(a)(1). Moreover, in **Martinez**, we recognized that the trial court "mixed together facts of events occurring both before and as a result of the stop." **Id.** at 516. In the case *sub judice*, however, the undisputed testimony shows that Officer Opalski's observations regarding the location and size of the bulge in Appellant's waistband led him to believe that Appellant possessed a firearm, which, in turn, prompted him to detain Appellant.

As such, we are persuaded that this case stands on all fours with our recent *en banc* decision in **Commonwealth v. Carter**, 105 A.3d 765, 766 (Pa. Super. 2014) (*en banc*), where we concluded, on very similar facts, that the officer's objective and particularized suspicion legitimately supported the challenged investigatory detention.[6] **See Carter**, 105 A.3d at 774-775

_____

[6] We reject Appellant's suggestion that **Carter** is distinguishable since "no bulge [was] observed on Appellant at initial view." **See** Appellant's Brief at
*(Footnote Continued Next Page)*

(police officer had reasonable suspicion for investigatory detention, where the defendant was standing on street corner in a high-crime area at night, had a weighted and angled bulge in his coat pocket, was alerted to the officer's presence and intentionally turned his body away several times to conceal the bulge in his coat pocket, and the officer observed the defendant walking away from known drug corner when officer repeatedly circled the area). For each of the foregoing reasons, we hold that Appellant is not entitled to relief on his suppression claim.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/5/2017

_(Footnote Continued)_ ⸺⸺⸺⸺⸺⸺

16. The only relevant fact is that Officer Opalski observed the bulge **before** commencing the stop.