J-S45018-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| HAROLD HAKEEM RAINIER | : | No. 982 MDA 2025 |

Appeal from the Order Entered June 27, 2025
In the Court of Common Pleas of Lycoming County Criminal Division at
No(s): CP-41-CR-0001342-2023

BEFORE: STABILE, J., MURRAY, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY MURRAY, J.:          **FILED: MARCH 10, 2026**

The Commonwealth of Pennsylvania files this interlocutory appeal from the trial court's order granting Harold Hakeem Rainier's (Rainier) motion to suppress evidence (Suppression Motion),[1] which he filed after the Commonwealth charged him with one count of possession with intent to deliver a controlled substance (PWID).[2] The Commonwealth claims the suppression court erred in determining that law enforcement lacked

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] The Commonwealth complied with Pa.R.A.P. 311(d), as it "certifie[d] in the notice of appeal that the order will terminate or substantially handicap the prosecution." ***Id.***; ***see also Commonwealth v. Petty***, 157 A.3d 953, 954 n.1 (Pa. Super. 2017) (citing Rule 311(d) and stating, "[t]he Commonwealth may appeal an interlocutory order suppressing evidence when it provides a certification with its notice of appeal that the order terminates or substantially handicaps the prosecution.").

[2] 35 P.S. § 780-113(a)(30).

reasonable suspicion to conduct a lawful investigative detention of Rainier. Because we conclude law enforcement possessed the requisite reasonable suspicion under the totality of the circumstances, we reverse the order of the suppression court and remand for further proceedings.

At the suppression hearing, the Commonwealth presented three witnesses:[3] two Lycoming County Narcotics Enforcement Unit (LCNEU) Detectives, and one confidential informant (CI-1), who cooperated with LCNEU. The suppression court summarized the evidence presented at the hearing in its opinion and order granting suppression:

> [LCNEU] Detective Robert Anderson ([Detective] Anderson) testified that he was part of a [joint] narcotics investigation of [a residence located on Second Street in] Williamsport, Lycoming County [("the residence"),[4] which also involved officers from the Williamsport Bureau of Police (WBP)]. Five separate [controlled] buys for methamphetamine and crack cocaine, and two attempted

_____

[3] Rainier, who was represented by retained counsel, presented no witnesses at either the suppression hearing or his preliminary hearing. However, at the suppression hearing, Rainier successfully moved for admission of the transcript of the preliminary hearing, held on October 17, 2023, before Lycoming County Magisterial District Judge Christian Frey. *See* N.T., 9/17/24, at 37-39, Defense Ex. 2; *see also* Commonwealth Brief Appx. E (preliminary hearing transcript). At the conclusion of the preliminary hearing, Judge Frey found that the Commonwealth had presented a *prima facie* case for PWID, and bound the charge over for court. *See* N.T., 10/17/23, at 11.

[4] The suppression court found that the residence is a "known drug house" to law enforcement and located in a "a high drug area[.]" Opinion and Order, 6/27/25, at 1.

buys of crack cocaine, occurred at [the residence] between February 2023 and October 4, 2023.[5]

On October 5, [2023, Detective] Anderson was present in the area [of the residence, while conducting surveillance,] with … [a different confidential informant, CI-2.[6] LCNEU Detective] Sarah Edkin [(Detective Edkin)[7]] was in the area [of the residence] with [CI-1]. [Law enforcement was] going to attempt another controlled buy [of narcotics from the residence on that date. Detective Anderson testified that other LCNEU officers surveilling the residence observed a] dark grey Kia Forte [drive up] to the residence, and a tall, skinny, black male with dreads exited the vehicle and entered the residence. Five or six minutes later, the black male exited the residence, and re-entered the Kia. [CI-1 observed this individual from her vantage point and informed Detective Edkin that the individual] was probably "Keem." "Keem" was described [by CI-1, who informed law enforcement that] "Keem" would supply [the residence] with drugs.[8]

[LCNEU Detective Tyson Havens (Detective Havens) also testified at the suppression hearing. Detective Havens stated that while he was conducting surveillance of the residence on October

_____

[5] The record is limited and does not reveal the identities of the confidential informants who conducted these controlled buys/attempted buys, or the seller(s) of the narcotics. **See**, **e.g.**, N.T. (suppression hearing), 9/17/24, at 4 (Detective Anderson detailing the controlled buys at the residence, albeit very briefly). Further, although the suppression court, in its Pa.R.A.P. 1925(a) opinion (Rule 1925(a) Opinion), found that "none of the controlled buys involved Rainier," Rule 1925(a) Opinion, 8/25/25, at 4, this finding is not supported by the record. There is no evidence that excluded Rainier as a potential perpetrator; rather, the record is silent on this point.

[6] CI-2 did not testify at the suppression hearing.

[7] Detective Edkin did not testify at the suppression hearing; however, she previously testified at Rainier's preliminary hearing. **See** N.T., 10/17/23, at 7-9.

[8] As discussed *infra*, CI-1 testified at the suppression hearing that although she did not see Rainier sell narcotics at the residence on October 5, 2023, she saw Rainier sell narcotics "[t]he day before and many others." N.T., 9/17/24, at 17; **see also id.** at 14-15.

5, 2023, he] observed the black male[, who had arrived at the residence in the grey Kia,] exit the residence [after a brief period. Detective Havens recognized the individual as Rainier from prior encounters, radioed Detective] Anderson[, and stated] that [the individual] was Rainier. [Detective] Anderson looked up Rainier [on his police computer] and discovered that Hakeem is [Rainier's] middle name.

Believing that Rainier was "Keem," the drug supplier, [Detective Havens] followed the Kia to Maynard Street, [observed it] enter Burger King, go through the drive-thru, exit Burger King, and proceed north on Maynard Street, where [WBP Officer Tyson] Minier [(Officer Minier)][9] stopped the vehicle.[10] [Detective] Anderson [subsequently] obtained a warrant to search the vehicle and found [one ounce] of methamphetamine in a black zipper bag. [Detective] Anderson sent the suspected methamphetamine to the lab. [At the suppression hearing, Detective] Anderson identified [] Rainier in the courtroom.

On cross-examination, [Detective] Anderson admitted that no information was relayed [to law enforcement] that[, on October 5, 2023,] Rainier was seen taking drugs into the residence, conducting a drug transaction, or leaving the [residence] with drugs.[11] [Detective Anderson testified there] were no [confidential informants] inside the residence while Rainier was inside it [on October 5, 2023]. Although [Detective Anderson] had no contact with anyone inside the residence while Rainier was

_____

[9] Officer Minier did not testify at either the suppression hearing or preliminary hearing.

[10] It is undisputed that the traffic stop was not based upon law enforcement's observation of any Motor Vehicle Code infraction. **See**, **e.g.**, N.T. (preliminary hearing), 10/17/23, at 5; Opinion and Order, 6/27/25, at 6 ("There was no testimony about the reason for the stop, or any observed motor vehicle violation to justify the stop."). Additionally, the suppression court explained that during the traffic stop, "Rainier admitted to the officers that he had a racquetball[-]sized amount of methamphetamine in a small bag in the vehicle." Opinion and Order, 6/27/25, at 1.

[11] Detective Anderson confirmed that, on October 5, 2023, "nobody witnessed" Rainier engage in "any criminal activity whatsoever[.]" N.T., 9/17/24, at 9; **see also id.** at 28 (Detective Havens confirming same).

- 4 -

inside, [Detective Anderson noted that CI-1] identified Rainier as "Keem" [to Detective Edkin] as [Rainier] went into the residence. [Detective Edkin] relayed that information to … [Detective] Anderson.

Opinion and Order, 6/27/25, at 2-3 (footnotes and some paragraph breaks added; some punctuation and quotation marks modified).

The suppression court also summarized CI-1's suppression hearing testimony:

[CI-1] testified that she was assisting the LCNEU.  On October 5, 2023[, CI-1] worked with Det[ective] Edkin.  [CI-1 testified, on that date, she] was at Belle's house[12] [(*i.e.*, the residence).  CI-1] was getting high and had [previously] been [at the residence] several times to get high.  [According to CI-1,] "Keem" came to the [residence] several times.  [CI-1] pointed to Rainier [in the courtroom] as "Keem[."  CI-1] knew [Keem] to supply the [residence] with crack.  On October 4, 2023[, CI-1] saw "Keem" inside [the] residence and deliver drugs.

[CI-1 testified that o]n October 5, [2023, CI-2, who was with Detective Anderson on that date,] came to rescue [CI-1] from the [residence].[13]  [CI-1] saw "Keem" enter [the residence],

_____

[12] It is undisputed that "Belle" is Cameron Belle (Belle), the owner of the residence and Rainier's father-in-law.  Rule 1925(a) Opinion, 8/25/25, at 9 n.4.  Law enforcement did not become aware of Rainier's relationship to Belle until after the traffic stop of Rainier's vehicle.  N.T., 9/17/24, at 10.

[13] As the suppression court explained,

[o]n October 5, [2023,] … [CI-2] was with Detective Anderson. [From his vantage point,] Detective Anderson could not see the [black male who arrived in the grey Kia] entering and exiting the residence.  Since [CI-2] was with Detective Anderson, [CI-2] also would not have seen the individual entering and exiting the residence.  [CI-2] was dating … [CI-1], and was concerned that [CI-1] was involved in drugs in the [residence].

*(Footnote Continued Next Page)*

pointed to him, and said that's the guy who delivers drug[s], but [CI-1] did not see "Keem" leave the residence. Keem [was carrying] a book bag when he entered the residence[; CI-1] immediately relayed that information to [Detective] Edkin.

On cross[-examination, CI-1] testified that she did not see [Rainier] bring drugs in or out of the [residence on October 5, 2023]. [CI-1] had no conversation about drugs or any transactions that day.

On re-direct, [CI-1] testified that she saw Rainier deliver drugs [at the residence] the day before (Oct[ober] 4). [CI-1] said that Rainier would meet Belle in the kitchen [of the residence]. [When purchasing narcotics, CI-1] would go [to the residence] and wait for Rainier. Belle would [inform CI-1 that Rainier is] on his way. [According to CI-1, t]here were many people [at the residence] waiting for drugs, but not on this day (October 5).

*Id.* at 3-4 (footnotes and some paragraph breaks added; some punctuation modified).

Finally, the suppression court expounded upon Detective Havens's suppression hearing testimony:

[Detective Havens] testified that [while he was surveilling the residence on October 5, 2023,] he saw the Kia arrive and observed a black male exit the Kia and enter [the] residence. A short time later, [approximately] a minute or two, [Detective] Havens observed a [black] male exit the residence. When [this individual] exited, [Detective] Havens [was able to view his face and] realized then [that] the black male was Rainier[, with whom Detective

_____

Rule 1925(a) Opinion, 8/25/25, at 3 (internal citations and paragraph break omitted). The suppression court ruled that because CI-2 "did not testify at the [suppression] hearing," the court "ultimately did not consider Detective Anderson's testimony about what … [CI-2] told him because [CI-2's statements were] hearsay." *Id.*; *see also* N.T., 9/17/24, at 5 (Rainier's hearsay objection regarding CI-2's purported statements).

Havens was acquainted]….[14]  [Detective] Havens testified that he transmitted [information about] who he observed over [police] radio[.  Upon receiving this information, Detective] Anderson [entered] Rainier['s name into his vehicle's police computer] …. [Detective] Havens testified that [Detective] Anderson saw [on his police computer] that Rainier's middle name was Hakeem.

[When the Kia drove away from the residence, Detective] Havens [] followed the Kia … south to Burger King.  [Detective] Havens said that [law enforcement's] plan was to have a [WBP] officer, [*i.e.*, Officer] Minier, stop the vehicle when it left Burger King.  [Officer] Minier stopped the vehicle at the intersection of Maynard Street and First Street.  [Detective] Havens arrived to the location of the stop and assisted [Officer] Minier with stop. [Detective] Havens said that there was only one person in [the] vehicle.  ….

[Detective Havens] did say that the driver of the vehicle was the person that he saw both enter and exit the [residence]. [Detective Havens testified that when he observed Rainier exit the residence, Rainier had] in his possession a black ["]cross draw bag.["][15]  N.T., 9/17/24, at 22.]

[During the traffic stop,] Rainier identified himself to law enforcement.  [Detective Havens stated] Rainier did not reside at the [residence], but [Detective] Havens didn't recall where Rainier said he lived.  Rainier was asked to step out of [the] vehicle and remove the cross draw bag for officer safety.  Rainier laid his bag

---

[14] Detective Havens further testified that Rainier "came and went [from the residence] over a short period of time, which is consistent with a drug delivery and/or purchase," *i.e.*, based on Detective Havens's police training and experience.  N.T., 9/17/24, at 30; **see also** N.T., 10/17/23, at 7 (Detective Havens confirming at the preliminary hearing that the brief period of time in which Rainier was inside the residence "add[ed] to [Detective Havens's] suspicion[.]").

[15] The black bag is relevant to this appeal.  At Rainier's preliminary hearing, Detective Havens described the bag as a "fanny pack" that was "worn cross draw," *i.e.*, "worn across the shoulder."  N.T., 10/17/23, at 3 (capitalization and punctuation modified).  Detective Havens confirmed that, in his police experience, and that of his fellow LCNEU officers, "recently [], it's a new thing" for criminals to use "fanny packs … to store guns and drugs[.]" **Id.**

on the driver's seat. [Detective] Havens estimated that the stop lasted about 14 minutes. Toward end of the stop, Rainier admitted he had drugs in his bag and that he obtained them inside [the residence]. [Detective] Havens said that Rainier claimed he was being a good Samaritan by taking the drugs to try to clean up the [residence]. ….

On cross-examination, [Detective] Havens stated he was not sure how long he had been surveilling [the residence on October 5, 2023]. He estimated that it was … probably about 10-15 minutes. [Detective] Havens acknowledged that he testified at the preliminary hearing that … [during his surveillance,] he saw [two males] go in [the] residence and [stated] that they are known [to law enforcement as] drug dealers.[16] Rainier had the cross draw bag on when he went both into and out of the residence.

[Detective] Havens [conceded that he] did not see anything that happened inside [the] residence [on October 5, 2023]. [Detective] Havens testified that [law enforcement] had quite a bit of information about [drug activity at] the residence, but not on that particular da[te] and time. The information law enforcement had was that [the residence] was a drug house.[17] … [Detective Havens] also felt [that law enforcement] had a lot of

_____

[16] **See** N.T., 10/17/23, at 2-3, 5 (Detective Havens's preliminary hearing testimony regarding his observation of two individuals, who were known to law enforcement, entering and exiting the residence on October 5, 2023); **see also** N.T., 9/17/24, at 27 (Detective Havens confirming at the suppression hearing that these two individuals were "known drug dealers[.]").

[17] Detective Havens elaborated that law enforcement was "inundated with information about [the residence] being a drug house. We get tip after tip after tip and informant after informant after informant that tells us this house is a problem." N.T., 9/17/24, at 30. Moreover, at Rainier's preliminary hearing, Detective Havens testified that law enforcement "may have 1 conviction" associated with the residence, and "served at least 1 search warrant and we ma[de] 3 arrests at the [residence] so far." N.T., 10/17/23, at 2.

information about Keem selling [narcotics at the] residence.[18] [Detective] Havens acknowledged that a lot of people go by [the] name "Keem" …. [Detective] Havens said that he saw Rainier's face and knew who he was.

[Detective Havens testified that law enforcement] also had [communications with] a [confidential informant] who [was] dating [CI-1, *i.e.*, CI-2], and [explained that CI-2 was] worried about [CI-1] doing drugs[. Detective Havens testified law enforcement] sent [CI-2 into the residence to] get [CI-1] out of the [residence]. [Detective Havens testified that, on October 5, 2023, CI-1] identified Rainier as "Keem". [According to Detective Havens, law enforcement] knew about the drug transactions [at the residence that occurred on October 4, 2023. Detective] Havens did not remember if he was present on October 4 when the transactions happened or if there was any surveillance [of the] residence on that day. [Detective Havens testified that no controlled] buy was planned for …October 5[, 2023]. [Finally, Detective] Havens believed that Rainier told him [during] the traffic stop that [] Belle was his father-in-law.

Opinion and Order, 6/27/25, at 3-5 (footnotes and some paragraph breaks added; some punctuation modified).

Following Rainier's arrest on October 5, 2023, the Commonwealth charged him with one count of PWID. On April 5, 2024, Rainier filed his Suppression Motion. Rainier asserted that "the initial traffic stop of the vehicle and interrogation of [Rainier] were illegal and done in violation of [his] rights under Article 1, Section 8 of the Pennsylvania Constitution and the Fourth Amendment to the United States Constitution." Suppression Motion, 4/5/24,

---

[18] Detective Havens testified, "I had plenty of information about a guy named Keem, who was selling drugs to th[e] residence, who matched the description of [] Rainier who I [] identified as Keem and then realized [that Rainier's] middle name is Hakeem." N.T., 9/17/24, at 29.

¶ 5.[19]  Rainier sought suppression of "all evidence and fruits of such evidence that were gained as a result of the illegal search of [Rainier]."  *Id.* (prayer for relief).[20]

Rainier's suppression hearing occurred on September 17, 2024. Detective Anderson, Detective Havens (collectively, "the Detectives"), and CI-1 testified as the only witnesses.  Following the conclusion of evidence, the suppression court considered argument from the parties.  *See* N.T., 9/17/24, at 39-43.  Rainier argued, in relevant part, that

> [t]he testimony [of the Detectives] was they didn't see [Rainier] engage in any … criminal activity while he was [at the residence on October 5, 2023, or] any criminal activity as he left.  The only identification [that the Detectives offered] was from a [CI-1] saying that it was Keem, but nothing from that day[, *i.e.*, October 5, 2023].  So we have … no facts that [Rainier] did anything wrong on that day whatsoever other than he showed up at [the] residence and left [the] residence and that is it.
>
> * * *
>
> So [although the Detectives] had information allegedly that [the residence] was being used by Rainier] to supply drugs, [] they couldn't give us any evidence of when the last time that would have been.

*Id.* at 39; *see also id.* at 40 (Rainier arguing that although CI-1 testified she saw Rainier sell narcotics at the residence "the day before" October 5, 2023,

---

[19] The Suppression Motion did not expressly claim law enforcement lacked reasonable suspicion to lawfully stop Rainier's vehicle.  *See generally* Suppression Motion, 4/5/24.

[20] The Commonwealth filed no written response to the Suppression Motion.

"[n]obody else testified to the day before."), and *id.* at 41 (Rainier asserting law enforcement "didn't corroborate [that] anything happened [at the residence] the day before.").

In its argument at the suppression hearing, the Commonwealth countered that Rainier

> is arguing for much higher standards [of proof]. The standard is a reasonable suspicion that a crime is occurring or has occurred[. Law enforcement was] allowed to stop [Rainier's vehicle]. .... [Law enforcement was not] just stopping any individual that was going in and out of the [residence]. What they were looking for was the individual that was supplying drugs to [the residence].

*Id.* at 42-43. The suppression court took the matter under advisement.

On June 27, 2025, the suppression court filed its opinion and order granting suppression, concluding that "[t]he stop of Rainer's vehicle was not supported by reasonable suspicion and was unlawful." Opinion and Order, 6/27/25, at 9. The court found that

> based on [CI-1's] statement that Rainier had brought drugs to the [residence] in the past, the members of the LCNEU thought that Rainier was bringing drugs to the residence[,] but no testimony was presented to establish what [Rainier] was doing at [the residence] on October 5[, 2023]. It does not appear that [Officer] Minier had the required reasonable suspicion to stop Rainier. There was no testimony presented that Rainier was operating the vehicle in violation of the Motor Vehicle Code. It is clear that the sole purpose for the stop of Rainier's vehicle was to investigate him for possible drug activity.

*Id.* at 7 (formatting and some capitalization modified). The suppression court further found that "[a]lthough [CI-1] testified that Rainier supplied the [residence] with drugs on October 4[, 2023], no evidence was presented

- 11 -

regarding the reliability of [CI-1]. In fact, [CI-1] admitted that she was getting high at the residence" on October 5, 2023. *Id.*; *see also id.* (pointing out that no evidence was presented that CI-1 "was involved in any of the successful controlled buys" that occurred at the residence between February and October of 2023, or the exact dates on which those buys took place).

On July 14, 2025, the Commonwealth filed a timely notice of appeal that included its Pa.R.A.P. 311(d) certification. The Commonwealth subsequently filed a court-ordered Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal.

The suppression court issued its Rule 1925(a) opinion on August 25, 2025. Therein, the court concluded that law enforcement lacked reasonable suspicion to conduct an investigative detention of Rainier, where they "only had a hunch that Rainier was in possession of drugs [on October 5, 2023,] and that hunch was the only basis for stopping Rainier's vehicle." Rule 1925(a) Opinion, 8/25/25, at 9. The suppression court found reasonable suspicion was lacking where

> [t]he only non-hearsay testimony[21] about Rainier allegedly being involved in criminal activity [derived from] the testimony of [CI-1], which was not credible/reliable. [CI-1] was a rogue [confidential informant], who was high [on narcotics] at the time she gave information to Detective Edkin [on October 5, 2023]. *See* N.T., []9/17/24, at 13. [CI-1] was not at the residence on

_____

[21] We reiterate the suppression court's ruling that any testimony regarding what CI-2 may have said to law enforcement on October 5, 2023, was inadmissible as hearsay, as CI-2 did not testify at the suppression hearing. Rule 1925(a) Opinion, 8/25/25, at 3-4.

October 4 and October 5[, 2023,] as a [confidential informant]; she was there getting high. [CI-1] would have said anything to redeem herself as a [confidential informant]. There also was no testimony that [CI-1] was involved in any of the successful controlled buys [that previously occurred at the residence,] or when any of the successful controlled buys occurred. If [Detective] Anderson could not recall the specific dates of the controlled buys, the Commonwealth could easily have refreshed Detective Anderson's recollection with his [police] reports related to the buys. Due to this lack of evidence and the fact that [CI-1] was a rogue [confidential informant] who was high on drugs, the Commonwealth failed to establish the reliability/credibility of [CI-1].

*Id.* at 4 (paragraph break omitted; footnote added); *see also id.* at 7 (opining that "[u]sing drugs can affect an individual's ability to accurately perceive individuals and events.").

According to the suppression court, "the Commonwealth is ignoring the fact that this case is not about the residence but the alleged criminal activity of Rainier." *Id.* at 7. The suppression court further maintains it

never said that reasonable suspicion had to be based on the personal observations of the officer conducting the [traffic] stop. …. The court [did] stat[e] that there had to be evidence of observations of criminal or suspicious activity on the date in question (October 5[, 2023]) for [law enforcement] to reasonably believe that criminal activity was afoot. The court found that there were no observations of criminal or suspicious activity on the date in question. Both [of the D]etectives testified that they did not see [Rainier engage in] any criminal activity on the date in question.

*Id.* at 4-5 (paragraph break omitted); *see also id.* at 5 ("Even [CI-1] did not see Rainier engage in criminal activity on" October 5, 2023).

Finally, according to the suppression court, "[t]here also was no evidence that Rainier was engaging in furtive movements" while law

- 13 -

enforcement observed him outside of the residence, "clutching the black cross draw bag [un]usually tightly, looking around like his head was on a swivel[,] or anything of that nature when he entered or exited [the] residence." *Id.* at 8-9 (footnote omitted).

On appeal, the Commonwealth presents a single issue for review:

Whether the [suppression] court abused its discretion and erred as a matter of law in determining that there was a lack of reasonable suspicion to support the stop of [Rainier's] vehicle.

Commonwealth's Brief at 9.[22]

We are mindful of our standard of review:

We review the grant of a suppression motion to determine whether the record supports the [suppression] court's factual findings and whether the legal conclusions drawn from those facts are correct. We defer to the suppression court's factual findings if they are supported by the record. We, however, give no such deference to the suppression court's legal conclusions and, instead, review them *de novo*.

*Commonwealth v. Seeney*, 316 A.3d 645, 648 (Pa. Super. 2024) (internal citations and quotation marks omitted). "Our scope of review of suppression rulings includes only the suppression hearing record[.]" *Commonwealth v. Yandamuri*, 159 A.3d 503, 516 (Pa. 2017) (citation and footnote omitted). Where, as here, "the defendant prevailed in the suppression court, we may consider only the evidence of the defense and so much of the evidence for the Commonwealth as remains uncontradicted when read in the context of the

---

[22] Rainier did not file an appellee's brief or any form of response.

record as a whole." *Commonwealth v. Tillery*, 249 A.3d 278, 281 (Pa. Super. 2021) (citation and brackets omitted).

It is well settled that appellate courts "are highly deferential to the suppression court's factual findings and credibility determination[s]." *Commonwealth v. Carmenates*, 266 A.3d 1117, 1123 (Pa. Super. 2021) (*en banc*). "The suppression court is free to believe all, some or none of the evidence presented at the suppression hearing." *Commonwealth v. Byrd*, 185 A.3d 1015, 1019 (Pa. Super. 2018) (citation omitted).

"Once a motion to suppress evidence has been filed, it is the Commonwealth's burden to prove, by a preponderance of the evidence,[23] that the challenged evidence was not obtained in violation of the defendant's rights." *Seeney*, 316 A.3d at 648-49 (citation omitted; footnote added); *see also* Pa.R.Crim.P. 581(H) (same). "The Commonwealth satisfies its preponderance of the evidence burden if it proves to the satisfaction of the suppression court that the evidence was properly seized." *Commonwealth v. Fulton*, 345 A.3d 352, 360-61 (Pa. Super. 2025) (citation, quotation marks, and brackets omitted). Further, our Supreme Court has explained that "[t]he Commonwealth may sustain its threshold preponderance burden by

---

[23] As this Court has stated, "[t]he preponderance of the evidence is the lowest burden of proof in the administration of justice, and it is defined as the greater weight of the evidence, *i.e.*, to tip a scale slightly in one's favor." *Commonwealth v. Easter*, 331 A.3d 675, 680 (Pa. Super. 2025) (citations and internal quotation marks omitted).

means of circumstantial evidence." ***Commonwealth v. Anderson***, 340 A.3d 297, 309 (Pa. 2025).

"The Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution prohibit unreasonable searches and seizures." ***Commonwealth v. Jones-Williams***, 279 A.3d 508, 515 (Pa. 2022). "Jurisprudence arising under both charters has led to the development of three categories of interactions between citizens and police," including an investigative detention,[24] which "permits the temporary detention of an individual if supported by reasonable suspicion." ***Commonwealth v. Lyles***, 97 A.3d 298, 302 (Pa. 2014) (citations omitted).

> It is well settled that
>
> a police officer may detain an individual in order to conduct an investigation if that officer reasonably suspects that the individual is engaging in criminal conduct. This standard, less stringent than probable cause, is commonly known as reasonable suspicion.

***Commonwealth v. Metz***, 332 A.3d 92, 98 (Pa. Super. 2025) (citation and brackets omitted). To establish reasonable suspicion in support of an investigative detention, "a police officer must be able to point to specific and articulable facts leading him to suspect criminal activity is afoot." ***Commonwealth v. Holmes***, 14 A.3d 89, 95 (Pa. 2011); ***see also Commonwealth v. Feczko***, 10 A.3d 1285, 1291 (Pa. Super. 2010) (*en banc*)

---

[24] In the instant appeal, it is undisputed that the traffic stop of Rainier's vehicle constituted an investigative detention of Rainier. ***See***, ***e.g.***, Opinion and Order, 6/27/25, at 6; Commonwealth Brief at 24.

(stating that a police officer may stop a vehicle for investigatory purposes where the officer reasonably suspects that criminal activity is afoot).

"Reasonable suspicion is dependent on both the quantity and quality of the information police possess prior to detaining an individual." **Commonwealth v. Jefferson**, 256 A.3d 1242, 1248 (Pa. Super. 2021) (*en banc*). This Court has stated that

> certainty about individual factors has never been a prerequisite for reasonable suspicion. It is []settled that **to justify their decision to stop and briefly detain an individual, the police need not establish their suspicions to a level of certainty, a preponderance, or even a fair probability.**

*Id.* at 1251 (emphasis added; citation, quotation marks, and brackets omitted); ***see also id.*** at 1249-50 ("The reasonable suspicion inquiry falls considerably short of 51% accuracy, for… to be reasonable is not to be perfect." (internal citations, brackets, and quotation marks omitted)). However, law enforcement "must be able to articulate something more than an inchoate and unparticularized suspicion or hunch." **Commonwealth v. Carter**, 105 A.3d 765, 768-69 (Pa. Super. 2014) (*en banc*) (citation omitted). **See also In re J.V.**, 762 A.2d 376, 380 (Pa. Super. 2000) ("In order to assess whether [] reasonable [suspicion] existed, consideration is given to the specific reasonable inferences which the officer can draw from the facts in the light of his experience[,] but no consideration is given to his unparticularized suspicions or hunches." (citation omitted)).

The inquiry into whether reasonable suspicion exists "is an objective one, namely, whether the facts available to the officer at the moment of the intrusion warrant a man of reasonable caution in the belief that the action taken was appropriate." *Commonwealth v. Haines*, 166 A.3d 449, 457 (Pa. Super. 2017) (citation omitted). Importantly, this Court has stated that

> [i]n order to determine whether the police officer had reasonable suspicion, **the totality of the circumstances must be considered**. In making this determination, we must give due weight to the specific reasonable inferences the police officer is entitled to draw from the facts in light of his experience. Also, the totality of the circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer.

*Commonwealth v. Stilo*, 138 A.3d 33, 39 (Pa. Super. 2016) (citation omitted; emphasis added).

Our Supreme Court has explained that "a proper reasonable suspicion analysis considers the totality of the circumstances surrounding the stop and **affords due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience.**" *Commonwealth v. Lewis*, 343 A.3d 1016, 1029 (Pa. 2025) (emphasis added; citation, brackets, and quotation marks omitted); *see also Commonwealth v. Williams*, 980 A.2d 667, 671 (Pa. Super. 2009) ("Reasonable suspicion … must be assessed based upon the totality of the circumstances[,] viewed through the eyes of a trained police officer" (citation and ellipses omitted)).

In evaluating the totality of the circumstances, courts should consider factors such as, *inter alia*, "tips, the reliability of the informants, time, location, and suspicious activity." ***Haines***, 166 A.3d at 457 (citations and quotation marks omitted). Regarding the location of suspected criminal activity, our Supreme Court has held that although an individual's "mere presence in a high-crime area" is alone insufficient to authorize an investigative detention, "the fact that [a] stop occurred in a 'high crime area'" is a relevant factor to consider "in assessing the totality of the circumstances" regarding the existence or absence of reasonable suspicion. ***In the Int. of D.M.***, 781 A.2d 1161, 1164 (Pa. 2001) (quoting ***Illinois v. Wardlow***, 528 U.S. 119, 124 (2000)); ***see also Lewis***, 343 A.3d at 1030 (reiterating that "a suppression court may properly consider [whether an area is high in crime] among the totality of the circumstances when assessing whether reasonable suspicion existed at the time of a stop[,]" and explaining that "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." (quoting ***Wardlow***, 528 U.S. at 124)).

Regarding the appropriate weight to be assigned to an informant's tip to law enforcement, the United States Supreme Court has stated that "[i]f a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable." ***Alabama v. White***, 496 U.S. 325, 330-31 (1990).

Moreover, a report of criminal activity made to a police officer in person "must be given more weight than a mere anonymous phone call." *Commonwealth v. Williams*, 980 A.2d 667, 672 (Pa. Super. 2009) (stating that an in-person report both provides an officer the opportunity to observe the tipster's demeanor and assess their credibility, and subjects the tipster to criminal liability if they knowingly provide false information).

Instantly, the Commonwealth argues the suppression court erred as a matter of law in granting Rainier's Suppression Motion, and

> should have found that there was the requisite reasonable suspicion to support the stop of [Rainier's] vehicle …. In failing to correctly apply and interpret the totality of the circumstances test, the [suppression] court [] also erred in applying a stricter standard more akin to probable cause than reasonable suspicion in reaching its decision.

Commonwealth Brief at 38 (paragraph break omitted); *see also id.* at 20 (asserting the suppression court "did not cite any of the facts from [Rainier's] preliminary hearing transcript," which was admitted into evidence at the suppression hearing). The Commonwealth contends it

> presented several pieces of specific evidence, including the identification of the residence as a known drug house, the recognition of [Rainier] by both [CI-1] and [the D]etectives, the [brief] amount of time that [Rainier] was in the residence, the presence of known drug dealers at the residence [on October 5, 2023], and the cross draw bag [Rainier wore when entering and exiting the residence].

*Id.* at 43. Further, pointing to the five successful controlled buys that occurred at the residence between February and October of 2023, the Commonwealth asserts, the Detectives "were investigating ongoing criminal

activity at the residence; thus, the specific dates of [the] controlled buys [are] not necessary … and should not have been weighed so heavily" by the suppression court. *Id.* at 41 (punctuation modified).

According to the Commonwealth, the suppression court's

claimed credibility issue based on the Detectives' reliance on [CI-1's] identification of [Rainier] after [CI-1] had consumed drugs is unpersuasive and the court's characterization of [CI-1] as "rogue" is misplaced and weighed too heavily. The [suppression c]ourt neglected to recognize that [confidential informants] are deterred from providing false information to officers, that [confidential informants] are more likely to provide truthful information than other informants, [and] that independent police work can compensate for a [confidential informant's] lower indicia of reliability ….

*Id.* at 25 (internal record citation omitted; formatting modified); *see also id.* at 30 (asserting the suppression court "improperly weighed [the reliability of CI-1's] … information alone, rather than weighing it in light of the abundant information that the [Detectives] independently drew from, in determining whether the stop was justified.").

The Commonwealth contends "[r]easonable suspicion was established for Officer Minier to stop [Rainier's vehicle] because he received the dispatch from Detective Havens[,] who observed [Rainier's] activity [at the residence] and formed a basis of reasonable suspicion." *Id.* at 40; *see also id.* at 39-40 (citing *Commonwealth v. Walls*, 206 A.3d 537, 542 (Pa. Super. 2019) ("[P]recedent confirms that a law enforcement officer may conduct an investigative detention of a suspect based on reasonable suspicion formed in

whole or in part upon facts observed by a reliable source, such as another officer[.]")).

The Commonwealth relies on this Court's decisions in *Stilo*, 138 A.3d 33, and *Commonwealth v. Myers*, 728 A.2d 960 (Pa. Super. 1999). *See* Commonwealth Brief at 26-29. In *Stilo*, after the defendant (Stilo) was arrested and charged with drug possession, he filed a motion to suppress evidence. *Stilo*, 138 A.3d at 35. The evidence presented at the suppression hearing established that a police officer (Officer Cleaver) was conducting surveillance outside of a certain residence (the property) in Philadelphia, in response to receiving an anonymous tip that drug activity was occurring at the property. *Id.* at 34. Officer Cleaver observed Stilo arrive outside the property in a white Ford Explorer driven by an unknown individual. *Id.* at 34-35. Stilo exited the vehicle and "entered the basement of the property[,] where he remained for approximately three minutes." *Id.* at 35 (record citation omitted). The suppression court detailed what next transpired:

> As Stilo exited the property, an unknown white male arrived on location in a red Ford pickup truck and entered the property. Stilo re-entered the Ford Explorer and waited a few minutes. Shortly thereafter, the unknown white male exited the property and entered his truck. Both Stilo and the male left the location simultaneously. Stilo was followed [by law enforcement], stopped,[25] and removed from the vehicle. Officer Cleaver spoke to Stilo and Stilo gave the officer a clear Ziploc bag containing marijuana[; Stilo] was arrested. Following his arrest, Stilo was

---

[25] There is no indication in *Stilo* that police observed the Ford Explorer commit any Motor Vehicle Code violations.

searched and [police] recovered [additional narcotics] from his person ….

*Id.* (footnote added; internal record citations and brackets omitted).

In his suppression motion, Stilo claimed law enforcement lacked reasonable suspicion to believe he was engaged in criminal activity to justify the stop of the Ford Explorer. *Id.* Following a suppression hearing, the suppression court denied Stilo's motion, after which he was convicted of drug possession and sentenced. *Id.* Stilo appealed, challenging only the denial of his suppression motion. *Id.*

This Court affirmed, holding that our prior decision in *Myers*, *supra*, "support[s] the suppression court's decision to deny the motion to suppress." *Id.* at 38. We analyzed *Myers* as follows:

> In *Myers*, police officers began conducting surveillance of a home in Philadelphia [(the home)] after receiving a number of complaints that the home was the site of a drug trafficking operation. While conducting surveillance, the police arrested two persons for narcotics violations on March 25 and 26, 1997. On April 1, 1997, at approximately 5:00 p.m., the police observed a man enter the home, and exit two minutes later. Approximately one hour later, the officer observed a woman enter the ho[me] and then quickly depart. At 6:30 p.m., the officers observed Myers knock on the door of the home, gain admittance and depart approximately two minutes later. The surveillance officer thought he saw something in Myer[s]'s hand, but [Myers's hand] was closed. [Myers] then placed [the unknown item] in his pocket, entered his vehicle, and drove away. The officers followed [Myers], pulled him over,[26] removed him from his vehicle, and patted him down. During this pat-down, the officers discovered two plastic packets of crack cocaine. *See id.*, 728 A.2d at 961.

---

[26] There is no indication in *Myers* that police stopped Myers's vehicle based upon any Motor Vehicle Code infraction.

- 23 -

Myers was [charged with and eventually] convicted of … possession of cocaine.

On appeal, this Court held that the officers did have reasonable suspicion to stop Myers, explaining:

The police had received at least four citizen complaints regarding drug sales occurring at [the home]. While conducting surveillance of the [home], police had arrested two drug purchasers the weekend prior to [Myers's] arrest. On the day [Myers] was arrested, the police observed two other individuals enter and exit the [home] after only a few minutes - a male at 5:00 p.m. and a female at 6:00 p.m. When the police saw [Myers] do the same at approximately 6:30 p.m., they had reasonable suspicion to stop him for investigative purposes, since[,] in the eyes of a trained officer, the surrounding circumstances g[a]ve rise to reasonable suspicion that criminal activity [was] afoot.

*Id.* at 962-[]63 (citation omitted).

*Stilo*, 138 A.3d at 37 (footnote added; footnote in original omitted).

The *Stilo* Court, applying *Myers*, determined that Officer Cleaver possessed reasonable suspicion to support a lawful traffic stop of Stilo's vehicle, based on the following:

When police received the [anonymous] "narcotics complaint[" regarding the property,] Officer Cleaver "verified" the complaint in learning that the owner of the [property] had previously been arrested on drug charges by members of his narcotics unit. As such, police had information of a prior nexus [between] the [property] to drugs. During surveillance, police witnessed the same suspicious activity of Stilo and another individual, separately entering and then leaving the [property] after a very brief visit, within moments of each other. This activity was viewed through the eyes of a trained officer, Officer Cleaver, who believed it was a drug transaction.

*Id.* at 39 (footnote omitted); *see also id.* at 38 (observing that Officer Cleaver testified at the suppression hearing "that he had been a police officer for 16 years, had worked in the narcotics unit for six years, and had conducted several narcotics surveillances. [Officer Cleaver] had [previously] seen 'this type of interaction where an individual goes into a house and comes out a short time later.'" (internal record citations omitted)).

The *Stilo* Court concluded that

> **Stilo's argument fails because "[a] suppression court is required to take[] into account the totality of the circumstances—the whole picture."** *Commonwealth v. Carter*, … 105 A.3d 765, 769 (Pa. Super. 2014) [(*en banc*)] (quotations and citation omitted[; emphasis added]), *appeal denied*, 117 A.3d 295 (Pa. 2015). "[E]ven in a case where one could say that the conduct of a person is equally consistent with innocent activity, the suppression court [is not] foreclosed from concluding that reasonable suspicion nevertheless existed." *Id.* at 772. "In conducting a reasonable suspicion inquiry, a suppression court is required to afford due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience[.]" *Id.* at 773 (quotations and citation omitted).

*Stilo*, 138 A.3d at 39 (emphasis added). Moreover, we noted that

> this Court has held that "[t]he existence of arguably more persuasive means of corroboration [*i.e.*, controlled buy, observations of specifically prohibited transactions, or confirmation with other informants] did not by itself render insufficient that information which was produced by police action." *Commonwealth v. Woods*, … 590 A.2d 1311, 1314 (Pa. Super. 1991).

*Stilo*, 138 A.3d at 38 (footnote omitted).

Instantly, the Commonwealth persuasively argues that

> [l]ike the officers in *Stilo* and *Myers*, Detective Anderson and Detective Havens made reasonable inferences[,] based on their

law enforcement experience and training[,] to justify [the stop of Rainier's] vehicle. The totality of the circumstances presented a particularized and objective basis for the Detectives' reasonable suspicion, including the established nexus between the … residence and drug activity; the five (5) controlled buys and two (2) attempted controlled buys conducted at the residence between February of 2023 and October 5, 2023; [CI-1's] tip that there was drug activity at the residence on October 4, 2023 ([*i.e.*, CI-1] observed Rainier deliver drugs); the presence of other known drug dealers at the residence on October 5, 2023; the Detectives' knowledge of an alleged drug dealer [who sold drugs at the residence] named Keem; [CI-1's] identification of [Rainier] as Keem; [Detective Havens's] … recognition of [Rainier as he exited the residence]; the discovery that [Rainier's] middle name was Hakeem; the short amount of time that [Rainier] was in and out of the residence; and the black cross body bag [Rainier carried, which, Detective Havens maintained, was] consistent with bags used for the concealment of guns and drugs, … in and out of the residence. The [suppression] court failed to consider the overwhelming cumulative information that the [D]etectives had in comparison to what is legally necessary for a stop. If the totality of the circumstances test had been applied properly, the evidence would prove that it was reasonable for [the D]etectives to suspect that criminal activity was afoot that justified the stop and investigative detention of [Rainier].

Commonwealth Brief at 29-30 (paragraph break omitted).

Following our review of the record before the suppression court, including the notes of testimony from Rainier's preliminary hearing, we agree with the Commonwealth; its foregoing argument is supported by the record and the law. Initially, **Stilo** is closely analogous. Like the situation in **Stilo**, here,

police had information of a prior nexus [between] the [residence and] drugs. During surveillance, police witnessed … suspicious activity of [Rainier, whom police recognized from prior experience,] … entering and then leaving the [residence] after a very brief visit ….

***Stilo***, 138 A.3d at 39.

In the instant case, the record supports the suppression court's observation that law enforcement did not observe Rainier engage in any **criminal** activity on October 5, 2023. ***See***, ***e.g.***, N.T., 9/17/24, at 9, 28. However, the record does not support the court's determination that "there were no observations of [Rainier engaging in] … **suspicious** activity on the date in question." Rule 1925(a) Opinion, 8/25/25, at 5 (emphasis added). As the suppression court conceded, the residence is a "known drug house" and located in "a high drug area[.]" Opinion and Order, 6/27/25, at 1; ***see also*** ***Lewis***, 343 A.3d at 1021 (holding suppression courts may properly consider whether an area is high in crime "among the totality of the circumstances when assessing whether reasonable suspicion existed at the time of a stop"). Further, in the approximately seven months leading up to the date of Rainier's arrest, law enforcement had (1) conducted multiple controlled buys of narcotics from the residence, ***see*** N.T., 9/17/24, at 4 (Detective Anderson, albeit briefly, mentioning five prior successful controlled buys); and (2) effectuated "3 arrests at the [residence]" and "served at least 1 search warrant[.]" N.T., 10/17/23, at 2 (Detective Havens's testimony at the preliminary hearing). Indeed, Detective Havens testified that law enforcement was "inundated with information about [the residence] being a drug house" and had received multiple tips about drug activity at the residence from confidential informants. ***See*** N.T., 9/17/24, at 30.

Further, CI-1 testified that although she did not see Rainier sell narcotics at the residence on the date of his arrest (October 5, 2023), she saw him sell drugs there "[t]he day before and many others." *Id.* at 17. We acknowledge the suppression court discredited CI-1's testimony. *See* Rule 1925(a) Opinion, 8/25/25, at 4, and Opinion and Order, 6/27/25, at 7. We do not disturb this finding and accord it due deference. *See Carmenates*, *supra*, at 1123 (appellate courts must be highly deferential to a suppression court's credibility determination); *Commonwealth v. Cunningham*, 287 A.3d 1, 7 (Pa. Super. 2022) ("[W]e will not disturb a suppression court's credibility determinations absent a clear and manifest error."). However, **even without CI-1's testimony**, the Detectives possessed independent, articulable facts to reasonably believe that Rainier was engaged in criminal activity on October 5, 2023. *See White*, 496 U.S. at 330-31 (stating that if "a tip has a relatively low degree of reliability, more information will be required to establish the requisite quantum of suspicion than would be required if the tip were more reliable.").

The record reflects that on October 3, 2023, Detective Havens observed Rainier, whom the Detective recognized, both entering and exiting the residence while wearing a black fanny pack bag in a "cross draw" fashion across his shoulder. *See* N.T., 9/17/24, at 22. In Detective Havens's police experience, wearing such a bag in this fashion, in that particular

neighborhood, was consistent with the concealment of "guns and drugs[.]" N.T., 10/17/23, at 3; *see also* N.T., 9/17/24, at 22.

Detective Havens further testified that "[Rainier] came and went [from the residence] over a short period of time[.]" N.T., 9/17/24, at 30. In Detective Havens's police training and experience, the brevity of Rainier's visit "is consistent with a drug delivery and/or purchase[.]" ***Id.***; *see also* N.T., 10/17/23, at 7 (Detective Havens confirming, at Rainier's preliminary hearing, that the brief period of time in which Rainier was inside the residence (*i.e.*, approximately one or two minutes) "add[ed] to [Detective Havens's] suspicion"); ***Williams***, 980 A.2d at 671 (stating that whether reasonable suspicion existed at the time of an investigative detention must be "viewed through the eyes of a trained police officer[,]" and cautioning that reviewing courts must "not ignore the ability of experienced police officers to draw deductions and inferences which other persons might not make." (citation and quotation marks omitted)).

Finally, Detective Havens testified that in addition to CI-1 identifying Rainier, on October 5, 2023, as the drug supplier to the residence, **Detective Havens observed two known drug dealers entering and exiting the residence**. *See* N.T., 9/17/24, at 27; N.T., 10/17/23, at 2-3, 5.

In sum, we conclude the totality of the above-mentioned evidence, and all "reasonable inferences" that the Detectives were "entitled to draw from the facts in light of [their] experience," ***Stilo***, 138 A.3d at 39 (citation omitted),

established a particularized and objective basis for the Detectives to reasonably suspect that Rainier was engaged in criminal activity. **Id.**; **Myers**, 728 A.2d at 962-63; **see also Jefferson**, **supra**, at 1251 (stating that the reasonable suspicion standard does not require law enforcement to "establish their suspicions to a level of certainty, a preponderance, or even a fair probability"). The evidence of record belies the suppression court's finding that "the Detectives only had a hunch that Rainier was in possession of drugs … and that hunch was the only basis for stopping Rainier's vehicle." Rule 1925(a) Opinion, 8/25/25, at 9 (some capitalization modified). Accordingly, keeping in mind our standard of review, we conclude that law enforcement possessed the reasonable suspicion necessary to support its investigative detention of Rainier. **See**, **e.g.**, **Stilo**, 138 A.3d at 38-39.

Based upon the foregoing, as the suppression court erred as a matter of law in granting Rainier's Suppression Motion, we reverse the order granting the Motion and remand for further proceedings.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary


Date: 03/10/2026