J-S08029-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: J.W., A MINOR | : | IN THE SUPERIOR COURT |
| | : | OF PENNSYLVANIA |
| | : | |
| APPEAL OF: J.W., MINOR | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2363 EDA 2025 |

Appeal from the Adjudication of Delinquency July 8, 2025
In the Court of Common Pleas of Philadelphia County
Juvenile Division at No(s):  CP-51-JV-0000415-2025

BEFORE:  PANELLA, P.J.E., KUNSELMAN, J., and NICHOLS, J.

MEMORANDUM BY PANELLA, P.J.E.:                **FILED APRIL 28, 2026**

J.W., a minor, appeals from the dispositional order adjudicating him delinquent and in need of treatment and supervision. J.W. argues the court erred when it denied his suppression motion. He further contends that he was adjudicated delinquent for carrying a firearm without a license although there was insufficient evidence that he did not, or could not, have a license. After careful review, we affirm.

On May 3, 2025, the Commonwealth filed a delinquency petition alleging J.W. committed the delinquent act of possessing a concealed firearm without a license, and thereby charged him with firearms not to be carried without a license, 18 Pa.C.S.A. § 6106(a)(1), possession of a firearm by a minor, 18 Pa.C.S.A. § 6110.1(a), and carrying firearms in public in Philadelphia, 18 Pa.C.S.A. § 6108. An adjudicatory hearing was continued multiple times due

to outstanding discovery. On June 6, 2025, J.W. filed a motion to suppress the physical evidence against him, arguing he was arrested without probable cause and stopped and frisked without reasonable suspicion.

On June 9, 2025, an adjudicatory hearing was held. At the beginning of the hearing, the court heard argument on the motion to suppress.

The Commonwealth called its sole witness, Officer Timothy Dollarton, to testify. Officer Dollarton testified that he had been a police officer for 13 years and that on May 3, 2025, at approximately 12:45 p.m., he was on duty in the area of 7400 Buist Avenue in Philadelphia, Pennsylvania. *See* N.T., 6/9/25, at 6-7. When asked to describe the area, Officer Dollarton explained that he has responded to robberies and car jackings in that area, which involved firearms in the commission of those crimes. *See id.* at 8.

Officer Dollarton explained that, on the date in question, he was the passenger in the police car, while his partner was driving. *See id.* at 9. While they were driving east on 7400 Buist Avenue, they observed J.W. walking westbound on the sidewalk, with his left arm tucked tight to his midsection. *See id.* As they continued driving east, Officer Dollarton turned around to look through the windows of the car. *See id.* 10. Officer Dollarton observed that J.W. kept turning around and looking in the direction of the police car, while he continued walking westbound. *See id.*

J.W. then walked into the middle of the street and continued to turn around to look in the direction of the police *See id.* Officer Dollarton's partner

started to make a U-turn. *See id.* As the police car made a U-turn to head westbound, Officer Dollarton saw J.W. run westbound and turn northbound at the next corner. *See id.* at 11. The police car did not have its lights or sirens activated. *See id.* When his partner made the same right turn, Officer Dollarton saw J.W. on the sidewalk "walking at that point." *Id.* at 12. *See id.* at 31. Officer Dollarton's partner started talking to J.W. through the window while both officers were still seated in the police car. *See id.* at 12-13. At that point, Officer Dollarton went to exit the vehicle, and J.W. took off running westbound. *See id.* at 13. Officer Dollarton testified that just prior to exiting the vehicle, he thought J.W. was trying to conceal a firearm. *See id.*

When J.W. began to run, Officer Dollarton engaged in a foot pursuit heading westbound into a grass field. *See id.* at 14. J.W. did not comply with Officer Dollarton's numerous verbal commands to stop. *See id.* J.W. continued to run into the grass field and collapsed on the ground. *See id.* Officer Dollarton detained J.W. and held J.W.'s arms up until his partner arrived. *See id.*

Officer Dollarton testified that as he chased J.W., he observed that J.W.'s left arm stayed tucked tight up against his body, while his right arm was moving freely. *See id.* Accordingly, Officer Dollarton believed J.W. was in possession of a firearm. *See id.*

Officer Dollarton explained what happened when he got to the grass field and detained J.W. as follows:

I held both his arms. I was able to get both of his arms and held them till my partner arrived and we were able to cuff him. While attempting to cuff him he laid on top of his left arm like under— he was on his, I guess, chest at this point. And he's lying on top of his left arm. So I had to struggle to get his arm out from underneath him. And when I was getting his arm to get behind his back, at some point, I don't know if he was cuffed yet or in the process of being cuffed, I felt a firearm in his left like jacket or hoodie sleeve. I forgot if it was a jacket or hoodie he was wearing.

*Id.* at 15. Officer Dollarton stated that he immediately recognized the object to be a firearm as soon as he touched it. *See id.* Finally, Officer Dollarton testified that he observed J.W. to have a "youthful appearance," explaining that "his eyes and facial features just looked young, his build." *Id.* at 15-16.

On cross-examination, defense counsel played video from both Officer Dollarton's and his partner's body worn cameras ("BWC"), as Officer Dollarton stated his BWC fell off at some point during the interaction. *See id.* at 18.

After watching the videos, Officer Dollarton initially explained that he was putting J.W. in cuffs because he felt a firearm in his sleeve, after running from the officers. *See id.* at 23 ("So I'm detaining him as there is a weapon in his sleeve."). Officer Dollarton was emphatic that he felt the firearm before J.W. was cuffed. *See id.*

Upon further questioning regarding what was seen on the BWCs, Officer Dollarton conceded: (1) at the time he was cuffing J.W., he did not know how old J.W. was or if he had a license to carry, (2) both he and his partner were in full uniform, had their tasers out at different times, and were using profanity during the interaction, (3) when first seen, J.W. was walking down the

sidewalk in broad daylight, and was not reaching for anything or going in his waistband, (4) that his partner first checked J.W.'s waistband and, when he did not find anything, his partner can be heard asking J.W. "where'd you toss it," and (5) at no point did Officer Dollarton see J.W. toss anything or see any bulge or anything gun related. *See id.* at 23-26. Officer Dollarton explained that he suspected J.W. had a firearm because of "[h]is arm close to his body in a high crime area with unprovoked flight from police." *Id.* at 26.

Finally, Officer Dollarton's witness statement, given on the date of the incident, was admitted into evidence. *See id.* at 34. As part of the statement, Officer Dollarton described the circumstances of the encounter as follows:

> At that point, I held [J.W.]'s arm until my partner [] arrived. While attempting to place [J.W.] into handcuffs, [J.W.] would not put his left hand behind his back. When I was able to pull his left arm behind his back, I immediately felt a firearm in his left hoodie sleeve. Myself and my partner was able to handcuff [J.W.] and [my partner] received the firearm from [J.W.]'s left sleeve.

Exhibit D3 at 1.

Following argument from both sides, the court denied the motion to suppress. The court immediately proceeded to an adjudicatory hearing, incorporating all non-hearsay evidence from the suppression hearing. *See id.* at 46. The Commonwealth presented no additional witnesses, and offered a report indicating the recovered firearm was operable as it's only additional evidence. *See id.* The defense also rested with no additional witnesses.

After hearing closing argument from both sides, the court found that the Commonwealth failed to meet its burden for Section 6110.1, possession of a

firearm by a minor,[1] because the elements of the crime indicate a specific age requirement, and no evidence of J.W.'s age was presented. However, the court found the Commonwealth met its burden for the remaining offenses, Section 6106(a)(1), firearms not to be carried without a license, and Section 6108, carrying firearms in public in Philadelphia.[2]

Following the hearing, the court entered an order finding J.W. guilty of Sections 6106(a)(1) and 6108, but deferring a disposition as to adjudication of delinquency. The court scheduled a disposition hearing for July 8. 2025.

On July 8, 2025, following the disposition hearing, the court entered an order adjudicating J.W. delinquent and finding him in need of treatment, supervision and/or rehabilitation.

On July 18, 2025, J.W. filed a motion to reconsider adjudication of delinquency, arguing there was no evidence of non-licensure to substantiate the Section 6106(a)(1) conviction, and that the charge of Section 6108 should be vacated and dismissed as unconstitutional. On August 15, 2025, following a brief hearing, the court denied the motion. This timely appeal followed.

J.W. raises the following issues on appeal:

1. Did the trial court err in denying J.W.'s motion to suppress where the police detained and subsequently arrested J.W. without reasonable suspicion or probable cause?

---

[1] 18 Pa.C.S.A. § 6110.1(a).

[2] 18 Pa.C.S.A. § 6108.

2. Was the evidence insufficient to establish that J.W. violated 18 Pa.C.S.[A.] § 6106 where the Commonwealth presented no evidence of non-licensure or that [J.W.] was ineligible to possess a firearm due to his age?

*See* Appellant's Brief, at 2-3.

In his first issue, J.W. argues the court erred in denying his motion to suppress. We begin with our well-established standard of review:

> An appellate court's standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, the appellate court is bound by those findings and may reverse only if the court's legal conclusions are erroneous. Where the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on the appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the trial court are subject to plenary review.

> Moreover, appellate courts are limited to reviewing only the evidence presented at the suppression hearing when examining a ruling on a pre-trial motion to suppress. Also, it is within the suppression court's sole province as factfinder to pass on the credibility of witnesses and the weight to be given their testimony.

*Commonwealth v. Wright*, 224 A.3d 1104, 1108 (Pa. Super. 2019) (citations, brackets, quotation marks, and ellipsis omitted).

J.W. argues he was seized the moment Officer Dollarton exited the police car. J.W. claims this created an investigative detention, and the police

did not have reasonable suspicion that criminal activity was afoot in order to support his seizure at that moment.[3] **See** Appellant's Brief, at 10-12.

Both "[t]he Fourth Amendment of the United States Constitution and Article I, Section 8 of the Pennsylvania Constitution prohibit unreasonable searches and seizures." ***Commonwealth v. Saunders***, 326 A.3d 888, 896 (Pa. 2024) (citation omitted). "It is quite plain that the Fourth Amendment governs seizures of the person which do not eventuate in a trip to the station house and prosecution for crime; whenever a police officer accosts an individual and restrains his freedom to walk away, he has seized that person." ***Commonwealth v. Gibson***, 333 A.3d 710, 717 (Pa. Super. 2025) (internal quotation marks, brackets, ellipsis, and citation omitted).

We begin with a discussion of the three types of police-citizen interactions:

> The law recognizes three distinct levels of interaction between police officers and citizens: (1) a mere encounter; (2) an investigative detention, often described as a ***Terry*** stop, ***see Terry v. Ohio***, 392 U.S. 1 [](1968); and (3) a custodial detention.

---

[3] We note that while J.W.'s statement of the question involved indicates he is challenging both the lack of reasonable suspicion to support his detention as well as the lack of probable cause to support his arrest, the argument section devoted to this issue solely addresses his contention that here was a lack of reasonable suspicion to support his detention. Accordingly, we limit our analysis to that specific claim. **See** Pa.R.A.P. 2119(a); ***see also B.S.G. v. D.M.C.***, 255 A.3d 528, 535 (Pa. Super. 2021) (holding that "[w]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived").

A mere encounter can be any formal or informal interaction between an officer and a citizen, but will normally be an inquiry by the officer of a citizen. The hallmark of this interaction is that it carries no official compulsion to stop or respond, and therefore need not be justified by any level of police suspicion.

In contrast, an investigative detention carries an official compulsion to stop and respond. Since this interaction has elements of official compulsion it requires reasonable suspicion of unlawful activity.

Finally, a custodial detention occurs when the nature, duration and conditions of an investigative detention become so coercive as to be, practically speaking, the functional equivalent of an arrest. This level of interaction requires that the police have probable cause to believe that the person so detained has committed or is committing a crime.

*Commonwealth v. Jefferson*, 256 A.3d 1242, 1247-48 (Pa. Super. 2021)

(*en banc*) (some citations, quotation marks, and ellipses omitted).

A mere encounter can

escalate[] to an investigatory stop if a reasonable person would have believed that he was not free to leave. When that happens, for the stop to be proper the police must have reasonable suspicion, based upon specific and articulable facts, that criminal activity is afoot. … [A] proper reasonable suspicion analysis considers the totality of the circumstances surrounding the stop and affords due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience. The totality of circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of innocent facts, when taken together, may warrant further investigation by the police officer. *Per se* rules are incompatible with a totality-of-the-circumstances inquiry.

*Commonwealth v. Lewis*, 343 A.3d 1016, 1028 (Pa. 2025) (citations,

brackets, and quotation marks omitted).

We have further elaborated:

No bright lines separate these types of encounters, but the United States Supreme Court has established an objective test by which courts may ascertain whether a seizure has occurred to elevate the interaction beyond a mere encounter. The test, often referred to as the "free to leave test," requires the court to determine whether, taking into account all of the circumstances surrounding the encounter, the police would have communicated to a reasonable person that he was not at liberty to ignore the police and go about his business. …

In applying this "free to leave" test, the focus is whether the suspect has in some way been restrained by physical force or show of coercive authority.

In considering whether a seizure has occurred, or whether a reasonable person would feel free to leave, courts may examine the following nonexclusive list of factors: The number of officers present during the interaction; whether the officer informs the citizen they are suspected of criminal activity; the officer's demeanor and tone of voice; the location and timing of the interaction; the visible presence of weapons on the officer; and the questions asked. Although no single factor controls our analysis, both the United States and Pennsylvania Supreme Courts have held that the approach of a police officer followed by questioning does not constitute a seizure. The circumstances must present some level of coercion, beyond the officer's mere employment status, that conveys a demand for compliance or threat of tangible consequences from refusal.

*Commonwealth v. Joyner*, 348 A.3d 230, 236 (Pa. Super. 2025) (citations, brackets, and some quotation marks omitted).

Based on the foregoing, we must first determine when J.W. was seized, *i.e.*, when the encounter turned from a mere encounter to an investigative detention. Then we can evaluate what information the officer possessed at that time and if that information qualifies as reasonable suspicion.

J.W. argues he was seized when Officer Dollarton exited the police car while his partner continued verbally engaging with him as he attempted to

walk away. *See* Appellant's Brief, at 11-12. The Commonwealth does not dispute an investigatory detention occurred, but does not identify exactly when it maintains the encounter turned into an investigative detention. *See* Appellee's Brief, at 6. Similarly, the trial court does not explicitly state when the encounter turned into an investigative detention. However, it appears the trial court believed it was after the foot pursuit. *See* Trial Court Opinion, 12/10/25, at 27 (listing multiple factors which enabled the officers to formulate reasonable suspicion including running from the officers on "two" occasions).

It is clear from viewing both BWCs that, after the officers followed J.W. for some time, and then started to verbally engage with him, J.W. clearly attempted to walk away from the officers; however, they did not allow him to do so. Instead, Officer Dollarton's partner continued to verbally engage with J.W. and followed him closely in the patrol car. While his partner drove the car and spoke to J.W., Officer Dollarton began opening his door, then closed it as the car continued driving alongside J.W. Shortly thereafter, Officer Dollarton successfully exited the car and immediately ran after J.W. Officer Dollarton also had his taser out during this foot pursuit; he could be heard shouting at J.W. that he was going to tase him if he did not stop. Even after J.W. was detained, Officer Dollarton's partner was seen pointing his taser directly at J.W., and told J.W. he would tase him if he did not allow them to put the cuffs on him.

As J.W. was not given an option to leave if he wanted to, we find J.W. was subject to an investigative detention at least at the moment Officer Dollarton got out of the car. *See Commonwealth v. Jones*, 226 A.3d 1090, 1095 (Pa. Super. 2021) ("[W]ith respect to the show of authority needed for a detention, the circumstances must present some level of coercion, beyond the officer's mere employment, that conveys a demand for compliance or threat of tangible consequences from refusal.") (citation omitted).

The next step is to determine whether the officers had reasonable suspicion of criminal activity at that time.

Here, the court found that Officer Dollarton established a firm foundation for his reasonable suspicion to detain J.W., reasoning as follows:

> As a police officer of thirteen years, with hundreds of arrests made over the course of his career, [Officer Dollarton] established he had the requisite experience to identify suspicious activities or scenarios. Officer Dollarton testified to the behavior of [J.W.] upon seeing his police vehicle: [J.W.], despite heading in the opposite direction of the vehicle, **continued to look back at the vehicle as he clutched his left arm tightly against his body.** Officer Dollarton did not know for certain at the time why [J.W.] was behaving this way, but it caused the officer to keep his eyes on [J.W.] as they drove past him. **What Officer Dollarton observed of [J.W.]—constantly looking back to check on the vehicle, even from the middle of the street, and running from the officers on two occasions—combined with his experience as a police officer and knowledge of the high crime area in which this interaction occurred, enabled him to formulate reasonable suspicion that criminal activity was afoot**.

Trial Court Opinion, 12/10/25, at 26-27 (citations omitted) (emphasis added).

After a review of the record, it is clear that the officers suspected J.W. of carrying a concealed weapon. However, mere possession of a firearm, without more, does not provide reasonable suspicion of criminal activity. *See Commonwealth v. Hicks*, 208 A.3d 916, 937 (Pa. 2019). Under certain circumstances, possession of a firearm can be suspicious and "[a] police officer is entitled to view individuals' conduct in light of the probabilities that criminal activity may be afoot, and indisputably may draw certain common sense conclusions about human behavior." *Id.* at 938 (internal quotation marks and citation omitted).

> Our analysis of the question at bar is guided by fundamental Fourth Amendment principles. We find no justification for the notion that a police officer may infer criminal activity merely from an individual's possession of a concealed firearm in public. … [I]t is not a criminal offense for a license holder[] to carry a concealed firearm in public. Although the carrying of a concealed firearm is unlawful for a person statutorily prohibited from firearm ownership or for a person not licensed to do so, *see* 18 Pa.C.S.[A.] §§ 6105-06, **there is no way to ascertain an individual's licensing status, or status as a prohibited person, merely by his outward appearance**. As a matter of law and common sense, a police officer observing an unknown individual can no more identify whether that individual has a license in his wallet than discern whether he is a criminal. Unless a police officer has prior knowledge that a specific individual is not permitted to carry a concealed firearm, and absent articulable facts supporting reasonable suspicion that a firearm is being used or intended to be used in a criminal manner, there simply is no justification for the conclusion that the mere possession of a firearm, where it lawfully may be carried, is alone suggestive of criminal activity.

*Id.* at 936-37 (footnote omitted)(emphasis added).

The firearms offenses charged all include the element that the perpetrator is unlicensed to carry a weapon, whether it be concealed or not.[4] Officer Dollarton conceded that, during the interaction, he did not know how old J.W. was or if he had a license to carry. While Officer Dollarton testified that he observed J.W. to have a "youthful appearance,"[5] *id.* at 15-16, he did not in any way tie this to the age of licensure. On its own, having a "youthful appearance" is not indicative of any particular age. ***See id.*** at 937. Someone who is 17 years old, 28 years old, or even 32 years old, could all be described as having a "youthful appearance."

Accordingly, this information on its own was not sufficient to support a reasonable suspicion that criminal activity was afoot.

_____

[4] In its opinion, the trial court states that J.W. "was carrying an operable concealed firearm on the streets of Philadelphia, which is prohibited, licensed or unlicensed." Trial Court Opinion, 12/10/25, at 32. However, 18 Pa.C.S.A. 6108 provides that persons in Philadelphia are allowed to carry a concealed firearm if they have a license to carry a firearm.

[5] In supporting its argument that the evidence was sufficient to prove Section 6106(a)(1), the Commonwealth concedes that it did not offer any direct evidence to establish J.W.'s non-licensure. However, the Commonwealth argues that circumstantial evidence existed to justify *the court's action* of adjudicating J.W. delinquent of the offense, because the very presence of J.W. in juvenile court was evidence that he was a minor at the time of the offense, and statutory law establishes that a minor is ineligible to obtain a license to carry a firearm. ***See*** Appellee's Brief, at 12.

While that may be relevant in support of *the court's decision* to adjudicate J.W. delinquent, as discussed further below, that after-the-fact circumstantial evidence is not relevant to whether or not reasonable suspicion existed *at the time of the detention*. The officers simply cannot support a detention with information learned after the fact.

However, the totality of the information the officers had before the encounter turned into an investigative detention included: the area being known for shootings, *i.e.*, high crime; J.W. continuously looking back at the police car nervously and running; J.W.'s odd behavior of holding his left arm tight to his body; and the officers' belief that this action was indicative of concealing a firearm.

Notably, our Supreme Court recently decided **Commonwealth v. Lewis**, 343 A.3d 1016 (Pa. 2025). There the Court considered "the quantum of evidence necessary to prove an area is high in crime, such that a suppression court may properly consider that fact among the totality of the circumstances when assessing whether reasonable suspicion existed at the time of a stop." **Lewis**, 343 A.3d at 1021. The Court noted:

> [In **Illinois v. Wardlow**, 528 U.S. 119, 124 (2000), the United States Supreme Court] explained that officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation. [The Court] therefore held the fact that the stop occurred in a high crime area was a relevant contextual consideration in assessing reasonable suspicion[.]
>
> At first blush, this principle seems unremarkable. If a proper reasonable suspicion analysis considers the totality of the circumstances surrounding the stop, then, logically, this might include the location of the stop in some cases. After all, we have recognized that prudent police officers on patrol pay close attention to every detail of their surroundings and take their knowledge of the area into account when considering a stop. Thus, for example, an officer observing a hand-to-hand transaction on a street corner will naturally be more suspicious if he knows the corner is a hotspot for heroin sales than if the corner has no meaningful history of drug trafficking. It would be simply illogical to expect officers to ignore those details, or to conclude that an

officer's experience regarding them is not a relevant factor informing reasonable suspicion.

*Id.* at 1030-31 (quotation marks, brackets, and citations omitted).

The Court then considered **Commonwealth v. Barr**, 266 A.3d 25 (Pa. 2021), where the defendant was stopped in his vehicle for a minor traffic infraction, and explained that "[u]nder those circumstances, the fact that the area where the stop occurred was generally high in crime would have added nothing probative to the legal determination of whether the police had probable cause to search the vehicle." **Lewis**, 343 A.3d at 1031. Clearly, then, the type of interaction helps the courts determine whether the area being high crime is relevant under the totality of the circumstances.

The **Lewis** Court held that whether an area is high crime is relevant in assessing reasonable suspicion, but an officer may not simply intone "high crime area." **Id.** "The Commonwealth bears the burden of proving a high-crime area is, in fact, high in crime, and the suppression court is free to discredit the Commonwealth's evidence when appropriate." **Id.** at 1035 (citations omitted). The Court provided a nonexclusive list of factors to assist in determining if an area is high crime: "the geographic scope of the high-crime area; the nexus between the type of crime the area is known for and the type of crime suspected on the day of the stop; the officer's level of familiarity with the area; the recency of the officer's information; empirical data known to the officer; and the assignment of specialized police units targeting high-crime areas." **Id.** at 1036 (citation omitted).

- 16 -

Here, the suppression hearing was held before *Lewis* was decided, but some of the factors were touched upon at the hearing. Upon questioning as to what he defined as the "high crime area," Officer Dollarton explained the area as "Elmood to Buist is where the gas station is that we've experienced car jackings. And then we've had—I'm trying, I don't know the exact dates. But we've experienced some shootings and homicides on the east side." *See* N.T., 6/9/25, at 27-28. Officer Dollarton clarified that he has not personally investigated the car jackings but has provided patrol by responding to calls for shootings and homicides in that area. *See id.* at 28-29. Officer Dollarton could not provide any specific dates about any recent calls or reports made, but stated they were "earlier in this year, from like February to April." *Id.* at 29. When asked to specify whether the car jackings he received patrol alerts for were during the daytime or at nighttime, Officer Dollarton stated he could not recall but said he has "responded to crimes any—all times of day in that area," and that gun related crimes "varies … all day". *Id.* at 30. We find the above information was sufficient for the trial court to qualify the area as a high crime area. Therefore, the area being high crime was a relevant consideration in determining whether the officers had reasonable suspicion.

As explained above:

> [A] proper reasonable suspicion analysis considers the totality of the circumstances surrounding the stop and affords due weight to the specific, reasonable inferences drawn from the facts in light of the officer's experience. The totality of circumstances test does not limit our inquiry to an examination of only those facts that clearly indicate criminal conduct. Rather, even a combination of

innocent facts, when taken together, may warrant further investigation by the police officer.

*Lewis*, 343 A.3d at 1029 (citations, brackets, and quotation marks omitted).

The information the officers had before the encounter turned to an investigative detention (the area being known for shootings, *i.e.*, high crime; J.W. continuously looking back at the police car nervously and running; J.W.'s odd behavior of holding his left arm tight to his body; and the officers' belief that this action was indicative of concealing a firearm), constituted sufficient reasonable suspicion to subject J.W. to a pat down or frisk for weapons. *See*

*Commonwealth v. Carter*, 105 A.3d 765, 775 (Pa. Super. 2014) (*en banc*) (reversing a trial court's order granting suppression because the defendant turned his body to conceal a bulge in his jacket pocket in a high crime area creating reasonable suspicion). Therefore, the trial court was correct in holding that there was reasonable suspicion to support his detention.

In his second and final issue, J.W. argues the court erred in finding him guilty of Section 6106(a)(1) when the Commonwealth failed to provide sufficient evidence that J.W. was not licensed to own a firearm. *See* Appellant's Brief, at 16.

> Our standard of review for a challenge to the sufficiency of the evidence is to determine whether, when viewed in a light most favorable to the verdict winner, the evidence at trial and all reasonable inferences therefrom are sufficient for the trier of fact to find that each element of the crimes charged is established beyond a reasonable doubt. The Commonwealth may meet this burden of proving every element of the crime by utilizing only circumstantial evidence.

The facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubt raised as to the accused's guilt is to be resolved by the fact-finder, so long as the evidence presented is not utterly incapable of supporting the necessary inferences. This Court does not independently assess credibility or otherwise assign weight to evidence on appeal.

**Commonwealth v. Riley**, 302 A.3d 112, 115 (Pa. Super. 2023) (citations, quotation marks, and brackets omitted).

To sustain a conviction of carrying a firearm without a license, the Commonwealth had to prove that J.W. "carried a firearm concealed on or about his person, except in his place of abode or fixed place of business, without a valid and lawfully issued license." 18 Pa.C.S.A. § 6106(a)(1). In other words, "[t]he Commonwealth must prove each of the factors listed in the definition: (a) that the weapon was a firearm ...; (b) that the firearm was unlicensed ...; and (c) that where the firearm was concealed on or about the person, it must be outside his home or place of business." **Commonwealth v. Lopez**, 565 A.2d 437, 439 (Pa. 1989).

Here, J.W. does not dispute that elements (a) and (c) were proven in this case. However, there is no testimony or other evidence of record that *directly* established that J.W. was unlicensed to carry a concealed firearm.

It is undisputed the Commonwealth did not offer any direct evidence to establish J.W.'s non-licensure. However, the Commonwealth argues that circumstantial evidence existed to justify the court's adjudicating J.W. delinquent of the offense, because the very presence of J.W. in juvenile court

- 19 -

was evidence that he was a minor at the time of the offense, and statutory law establishes that a minor is ineligible to obtain a license to carry a firearm. *See* Appellee's Brief, at 12.

Licenses to carry concealed firearms in Pennsylvania are only available to "[a]n individual who is 21 years of age or older...." 18 Pa.C.S.A. § 6109(b). Consequently, "[a] person under the age of twenty-one years is **absolutely disqualified** from obtaining a license under Section 6109...." *In re R.B.G.*, 932 A.2d 166, 171 (Pa. Super. 2007) (emphasis in original).

"The juvenile court has jurisdiction over children charged with delinquent acts." *In Interest of Ryan*, 419 A.2d 1224, 1225 (Pa. Super. 1980). The Juvenile Act defines "[c]hild" as an individual under the age of 18 years, or an individual under the age of 21 who was adjudicated delinquent, or committed a delinquent act, before reaching the age of 18 years. *See* 42 Pa.C.S.A. § 6302.

Accordingly, to be subject to the jurisdiction of the juvenile court, J.W. must have been under the age of 18 at the time he was arrested. Additionally, J.W.'s status as a defendant in juvenile court implies, without qualification, that J.W. is *under* the age of 21.

Therefore, it is an absolute impossibility that J.W. could have possessed a valid license to carry a concealed firearm. Accordingly, we agree with the Commonwealth that there was sufficient evidence of record to establish that J.W. was not licensed to carry a concealed firearm when he was arrested in

this case because, by the very nature of J.W.'s status as a defendant in juvenile court, he was ineligible to possess a license to carry a concealed firearm under Section 6109.

As we find both issues raised are without merit, we affirm the dispositional order.

Order affirmed.

Judgment Entered.



Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/28/2026